**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2404**

OSCAR ADILIO CRUZ-QUINTANILLA,

Petitioner,

v.

MATTHEW G. WHITAKER, Acting Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 31, 2018                          Decided: February 1, 2019

Before MOTZ, KEENAN, and HARRIS, Circuit Judges.

Petition for review dismissed in part, granted in part, and remanded for further proceedings by published opinion. Judge Harris wrote the opinion, in which Judge Motz and Judge Keenan joined.

**ARGUED:** Abraham Fernando Carpio, CARPIO LAW FIRM, LLC, Hyattsville, Maryland, for Petitioner. Sara J. Bayram, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Melissa Neiman-Kelting, Assistant Director, Jessica A. Dawgert, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

PAMELA HARRIS, Circuit Judge:

Oscar Adilio Cruz-Quintanilla, a native of El Salvador and legal permanent resident of the United States, faces removal as a result of two criminal convictions. As a former gang member, Cruz-Quintanilla fears he will be tortured if forced to return to El Salvador, and thus seeks relief under the Convention Against Torture. To qualify, he must establish not only that it is more likely than not that he will be tortured if removed, but also that the government will acquiesce in that torture. 8 C.F.R. § 1208.16(c)(2). An immigration judge denied Cruz-Quintanilla relief after holding that he had failed to demonstrate the requisite government acquiescence. The Board of Immigration Appeals, reviewing that determination as a factual finding subject to clear error review, affirmed.

We conclude that the Board applied the wrong standard of review. Whether Cruz-Quintanilla established that the government would acquiesce in his torture under 8 C.F.R. § 1208.16(c)(2) is a mixed question of law and fact, and the immigration judge's determination that the evidence did not meet the relevant standard is a legal judgment subject to de novo review by the Board. Accordingly, we grant Cruz-Quintanilla's petition for review and remand so that the Board may review the immigration judge's determination under the proper standard.

## I.

### A.

At the age of twelve, Oscar Adilio Cruz-Quintanilla lawfully entered the United States to live with his mother and stepfather in Montgomery County, Maryland. Two or

2

three years later, members of the MS-13 gang recruited Cruz-Quintanilla to join their ranks. He agreed, and as part of his initiation into MS-13, received four tattoos indicating his gang affiliation. Several of the tattoos – including an "X3" (representing the number 13) on his forearm and an "NSL" (designating the clique to which he belonged) on his hand – are readily visible. Although MS-13 forbids members from leaving the group, Cruz-Quintanilla left the gang in 2005 after a rival gang member shot him in the foot.

Cruz-Quintanilla continued to live in the Montgomery County area, and in 2013 a grand jury in Maryland state court indicted him in connection with a home robbery. A jury later convicted Cruz-Quintanilla on three counts: reckless endangerment; conspiracy to commit robbery with a dangerous weapon; and wearing, carrying, and transporting a handgun. Cruz-Quintanilla spent three years in prison as a result of these convictions. Following his release, the Department of Homeland Security took him into custody and initiated the removal proceedings that give rise to this appeal.

**B.**

Under 8 U.S.C. § 1227(a)(2), a noncitizen who has been convicted of certain crimes is removable. Those crimes include "aggravated felon[ies]," *id.* § 1227(a)(2)(A)(iii), and specific firearms offenses, *id.* § 1227(a)(2)(C). The government seeks to remove Cruz-Quintanilla under this statute, pointing to his conviction for conspiracy to commit armed robbery as an "aggravated felony" and his handgun conviction as a qualifying firearms offense.

Cruz-Quintanilla sought relief from removal under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the

3

"Convention"), 8 C.F.R § 1208.16(c). The Convention's implementing regulations authorize relief when an individual demonstrates that it is more likely than not that "he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). To satisfy this standard, a petitioner must make two distinct showings. *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012) (citing 8 C.F.R. § 208.16(c)(2)). First, the petitioner must demonstrate "likely future mistreatment." *Id.* at 530. Specifically, the petitioner must prove that it is more likely than not that, if removed, he will endure "severe pain or suffering" that is "intentionally inflicted." 8 C.F.R. § 1208.18(a)(1). And second, the petitioner must show that this "likely future mistreatment" "will occur at the hands of government or with the consent or acquiescence of government." *Turkson*, 667 F.3d at 526.

The second, "acquiescence" prong of the torture inquiry – directly at issue here – comes from the regulatory definition of "torture." That definition requires not only that the petitioner will endure "severe pain or suffering," but also that the harm will be "inflicted by . . . or with the consent or acquiescence of a public official." 8 C.F.R. § 1208.18(a)(1). "Acquiescence," in turn, is shown when a public official, "prior to the activity constituting torture, ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). And as this court has held, "awareness of such activity" includes "willful blindness." *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245–46 (4th Cir. 2013). In sum, where government agents themselves would not inflict the feared torture, a petitioner still may

4

establish government acquiescence by showing that the government would have actual knowledge of torture or that it would turn a "blind eye" to torture by third parties. *Id.*

An immigration judge heard Cruz-Quintanilla's case in June 2017. Cruz-Quintanilla testified that given his former membership in MS-13, he believed he would not be safe if removed to El Salvador. He feared that MS-13 would kill him for leaving the gang, or, given his visible gang-related tattoos, that a rival gang would attack him. Cruz-Quintanilla testified that gang members have extorted members of his family, and that one of Cruz-Quintanilla's cousins, a member of a rival gang, was shot because of his gang affiliation.

On the "acquiescence" prong of the torture inquiry, Cruz-Quintanilla alleged that Salvadoran officials would turn a blind eye to any efforts by either MS-13 or rival gang members to target him – and that government officials might even actively target him themselves, due to his former gang affiliation. He testified that police in El Salvador offer little protection in gang disputes, and that officers sometimes attack individuals with gang-related tattoos as vengeance for violence inflicted on the police by gangs. Cruz-Quintanilla also introduced into evidence the United States State Department's 2015 Human Rights Report on El Salvador, which details complaints received by the Salvadoran Office of the Ombudsman for Human Rights. According to that report, during the preceding year the Ombudsman received 17 complaints of alleged extrajudicial killings by government officials. In the same time period, it also received 2,202 complaints of human rights violations, more than 90 percent of which alleged misconduct by the Salvadoran police and military. Based on that evidence and his

5

testimony, Cruz-Quintanilla argued that it is more likely than not that if removed to El Salvador, he would be tortured by or with the acquiescence of the Salvadoran government.

The immigration judge found Cruz-Quintanilla credible, and agreed that Cruz-Quintanilla had "valid concerns that he might be harmed by MS-13 for no longer participating in his gang or by a rival gang, especially since he has MS-13-related tattoos." A.R. 131. She further recognized "serious concerns about crime, violence, and instances of official corruption in El Salvador." *Id.* Ultimately, however, the immigration judge concluded that the evidence was not "sufficient to show that it is more likely than not that [Cruz-Quintanilla] would be tortured *with the consent or acquiescence of the government in [] El Salvador*," pointing out that the State Department's Human Rights Report "indicates that the government of El Salvador is taking steps to address gang violence and instances of official corruption there." *Id.* (emphasis added). Accordingly, the immigration judge denied relief under the Convention, and ordered Cruz-Quintanilla removed to El Salvador.

Cruz-Quintanilla appealed the immigration judge's removal order to the Board of Immigration Appeals. He did not challenge the immigration judge's finding that he was removable, arguing instead that the immigration judge erred in finding him ineligible for relief under the Convention.

In a single-member decision, the Board dismissed Cruz-Quintanilla's appeal. The Board began by summarizing Cruz-Quintanilla's argument that "as a tattooed former gang member, deported from the United States, he is at risk of torture and death by gang

6

members and will not be able to obtain protection from the police." A.R. 3. That claim, the Board held, could not succeed because Cruz-Quintanilla could not establish "clear error" in the immigration judge's "factual finding that the Salvadoran government would not acquiesce in his torture." *Id.* (citing *Saintha v. Mukasey*, 516 F.3d 243, 249–50 (4th Cir. 2008)). "[D]iscern[ing] no clear error [in] the Immigration Judge's finding that the Salvadoran government does not acquiesce in torture," the Board concluded that the immigration judge's removal order was proper. *Id.*

Cruz-Quintanilla timely noticed his petition for review, and we granted Cruz-Quintanilla's motion for stay of removal pending appeal.

## II.

Cruz-Quintanilla raises two principal arguments before this court. First, he contends that the immigration judge and Board of Immigration Appeals incorrectly assessed the record evidence, and wrongly concluded that he had not established a likelihood that he would be tortured by or with the acquiescence of the Salvadoran government. Second, Cruz-Quintanilla argues that the Board used the wrong standard of review when it affirmed the immigration judge's decision. Although we lack jurisdiction over Cruz-Quintanilla's first argument, we may review his second. And because the Board improperly characterized the immigration judge's finding regarding government acquiescence as a purely factual determination subject only to clear error review, we

7

grant Cruz-Quintanilla's petition for review on that ground and remand his case so that the Board may apply the correct standard. [1]

## A.

Cruz-Quintanilla's first argument is that he produced sufficient proof that it is more likely than not that he will be tortured by or with the acquiescence of the Salvadoran government if he is removed, and that the immigration judge and Board erred in finding otherwise. Our jurisdiction over Cruz-Quintanilla's appeal is limited, however, and this claim falls outside those limits.

Removal orders – like this one – that involve noncitizens convicted of aggravated felonies or specific firearms offenses generally are not subject to judicial review. 8 U.S.C. § 1252(a)(2)(C); *see also id.* § 1227(a)(2)(A)(iii) (defining "aggravated felony" for purposes of § 1252(a)(2)(C)); *id.* § 1227(a)(2)(C) (defining "firearm offenses" for purposes of § 1252(a)(2)(C)). There is, however, an exception: In 2005, Congress amended this jurisdiction-stripping provision to confer "a narrowly circumscribed jurisdiction to resolve constitutional claims or questions of law" raised by petitions challenging such orders. *Higuit v. Gonzales*, 433 F.3d 417, 419 (4th Cir. 2006); *see also* 8 U.S.C. § 1252(a)(2)(D).

---

[1] Cruz-Quintanilla also advances a third, due process-based argument regarding a motion he filed to re-open his pleadings before the immigration judge, denied by the judge as untimely. Because Cruz-Quintanilla did not appeal that denial to the Board of Immigration Appeals, he failed to "exhaust[] all administrative remedies available to [him] as of right," 8 U.S.C. § 1252(d)(1), and we therefore lack jurisdiction to consider this claim. *See Asika v. Ashcroft*, 362 F.3d 264, 267 n.3 (4th Cir. 2004) (per curiam).

Here, the immigration judge found that Cruz-Quintanilla had been convicted of a qualifying aggravated felony and firearms offense, triggering § 1252(a)(2)(C)'s jurisdiction-stripping provision. We therefore have jurisdiction only to review "constitutional claims" and "questions of law" presented by Cruz-Quintanilla's challenge to his removal order. 8 U.S.C. § 1252(a)(2)(D). Cruz-Quintanilla makes no contention that his first argument – that the immigration judge and the Board improperly weighed the evidence in his case – amounts to a constitutional claim. The only remaining question is whether that argument raises a question of law for purposes of the § 1252(a)(2)(D) exception or instead challenges a finding of fact. We hold that it does the latter.

We addressed precisely this question in *Saintha v. Mukasey*, 516 F.3d 243, 249–50 (4th Cir. 2008), and held that an argument almost identical to Cruz-Quintanilla's constituted a challenge to a factual determination over which we lacked jurisdiction. Like Cruz-Quintanilla, the petitioner in *Saintha* argued that the Board "erred in finding insufficient evidence to conclude that the [] government would likely acquiesce in his torture." *Id.* at 247–48. We concluded that we lacked jurisdiction over that claim, as "determinations regarding governmental acquiescence" are "properly characterized as factual, not legal, in nature" under § 1252's jurisdictional provisions. *Id.* at 250. And although Cruz-Quintanilla describes his argument as one that challenges both "factual findings and conclusions of law," the undeniable crux of his claim is the same as that presented in *Saintha*: that he in fact "proved [] acquiescence by the Salvadoran government officials," and that the agency erred in concluding otherwise. Pet'r's Br. 9, 15. Because we lack jurisdiction to hear challenges to factual findings, we are unable to

9

review the merits of Cruz-Quintanilla's contention and dismiss that portion of his petition for review.

**B.**

Cruz-Quintanilla next contends that the Board applied the wrong standard of review in affirming the immigration judge's determination that he is ineligible for relief under the Convention. As we have explained before, whether the Board has applied the proper standard of review is a question of law for purposes of § 1252(a)(2)(D), *Upatcha v. Sessions*, 849 F.3d 181, 184 (4th Cir. 2017), and the government does not dispute that we have jurisdiction under that provision. Our review of this legal issue is de novo, *id.*, and we conclude that the Board applied the wrong standard of review to the immigration judge's finding that Cruz-Quintanilla did not establish a likelihood of government acquiescence within the meaning of the regulations.

The Board's review of immigration judges' decisions is governed by 8 C.F.R. § 1003.1(d)(3). Until 2002, that regulation provided for de novo review by the Board of all aspects of such decisions. In 2002, however, new regulations established a bifurcated standard of review. Under the new standard, "findings of fact determined by an immigration judge" are excepted from the general rule calling for de novo review, and instead reviewed only for clear error. 8 C.F.R. § 1003.1(d)(3)(i). But the Board continues to review de novo "all other issues," *id.* § 1003.1(d)(3)(ii), including, in cases involving mixed questions of law and fact, the application of the governing legal standard to the facts found by the immigration judge, *Upatcha*, 849 F.3d at 184; *Massis v. Mukasey*, 549 F.3d 631, 636 n.6 (4th Cir. 2008). So to decide whether the Board

10

properly applied clear error review in this case, we must first consider whether the immigration judge's determination that Cruz-Quintanilla's evidence failed to establish government acquiescence represents a purely factual finding or the answer to a mixed question of law and fact.

Our precedent makes clear that it is the latter. We already have held that the first prong of the torture inquiry – whether a petitioner has shown "likely future mistreatment" that satisfies the regulatory definition of "torture" – is a mixed question of law and fact under 8 C.F.R. § 1003.1(d)(3). *Turkson*, 667 F.3d at 529, 530. An immigration judge's holding that a noncitizen likely will or will not face harm amounting to torture, we recognized, does involve a purely factual determination – subject to clearly erroneous review – in the form of a prediction as to "what would likely happen" to the noncitizen if removed. *Id.* at 528–29 (citing *Kaplun v. Att'y Gen.*, 602 F.3d 260 (3d Cir. 2010)). But whether that predicted outcome satisfies the regulatory definition of "torture," we held, is a distinct question. *Id.* And an immigration judge's answer to *that* question constitutes a "legal judgment" subject to de novo review, as it necessarily involves "applying the law to decided facts." *Id.* at 528.

Here, we consider whether *Turkson*'s hybrid approach to the first prong of the torture inquiry applies also to the second, "acquiescence" prong. We conclude that it does. As *Turkson* explained with respect to a petitioner's future treatment, the "acquiescence" prong, too, first requires that an immigration judge make an essentially factual prediction as to "what would likely happen" upon removal – here, a "factual finding or findings as to how public officials will likely act in response to the harm the

11

petitioner fears," *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017). Those factual findings are reviewable by the Board only for clear error, consistent with the relevant regulations. 8 C.F.R. § 1003.1(d)(3)(i). But just as the immigration judge in *Turkson* was required to take another step, applying the regulatory definition of "torture" to his predictive factual findings, so too here: The immigration judge in this case was required to decide whether "how public officials will likely act" qualifies as "acquiescence" under the relevant regulations. And like the Third Circuit, we think that determination amounts to a legal judgment that must be reviewed by the Board de novo. *Accord Myrie*, 855 F.3d at 516–17.

Indeed, we can find no way to differentiate *Turkson* on this point. The regulations establish a legal definition for "acquiescence" just as they define the suffering necessary to constitute "likely future mistreatment," *Turkson*, 677 F.3d at 530. *See* 8 C.F.R. §§ 1208.18(a)(1), (a)(7). *Turkson* makes clear that whether "what would happen" satisfies the "likely future mistreatment" prong of the torture inquiry is a legal judgment, 667 F.3d at 528–29, and the same reasoning applies for whether "what the government would do" meets the standard for the "acquiescence" prong. And while the Board reviews the immigration judge's specific findings as to what will happen and what the government will do for clear error only, the regulations require that it apply de novo review when it comes to the immigration judge's "*application of the standard of law to those facts.*" *Upatcha*, 849 F.3d at 184 (internal quotation marks omitted).

Our conclusion follows the holding of the only other court of appeals to address this question. *See Myrie*, 855 F.3d at 516–17 (holding that an immigration judge's

12

assessment of whether the likely response from public officials qualifies as acquiescence is a legal question subject to de novo review by the Board). It also is fully consistent with a line of cases from this court treating very similar immigration judge determinations as mixed questions of law and fact. In *Massis*, for instance, we applied the same bifurcated approach to an immigration judge's grant of a discretionary waiver, holding that while the clearly erroneous standard applies to the determination of "'what happened' to the individual," the Board reviews de novo "application of the law to those facts – to determine, for example, whether those facts amount to 'exceptional and extremely unusual hardship.'" 549 F.3d at 636 n.6 (quoting Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,888–90 (Aug. 26, 2002) (to be codified at 8 C.F.R. pt. 3)). We likewise held in *Upatcha* that an immigration judge's determination as to whether a noncitizen has entered into a marriage in "good faith" involves both findings of historical fact, reviewed by the Board only for clear error, and also a legal judgment as to whether those facts satisfy the regulatory standard for good faith marriage, which must be reviewed by the Board de novo. 849 F.3d at 185. And that is before we even get to *Turkson*, of course, in which we took this same approach to the other half of the very torture inquiry before us now.

The Board did not follow that approach here. Instead, it treated government acquiescence as a solely factual finding subject to clear error review, citing our holding in *Saintha* for support. It is true, as discussed above, that *Saintha* describes an immigration judge's determination as to government acquiescence as a factual finding that we lack

13

jurisdiction to review. 516 F.3d at 250. But whether a court has jurisdiction to review an agency acquiescence determination is a separate question from how the Board should review the acquiescence findings of an immigration judge, and *Saintha* speaks only to the first question, not the second.

At issue in *Saintha* was § 1252(a)(2)'s "jurisdiction-stripping" provision, which commits certain immigration matters – including challenges to removal orders by petitioners like Cruz-Quintanilla – to the "sound discretion of the Executive" rather than that of the judiciary. *Higuit*, 433 F.3d at 420; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999) (describing the "theme of the legislation" as "protecting the Executive's discretion from the courts"). When Congress amended that provision to except constitutional claims and questions of law, it was clear that Congress intended only a narrow exception, and that the "default" rule remained that the agency and not the courts should have the final word. *Higuit*, 433 F.3d at 419. And it was against this background that *Saintha*, emphasizing the "narrow scope" of § 1252(a)(2)(D)'s exception, 516 F.3d at 248, held that a final agency determination on acquiescence is for jurisdictional purposes a factual finding, outside the "narrowly circumscribed jurisdiction" of the federal courts, *id.* (quoting *Higuit*, 433 F.3d at 419).

Here, on the other hand, we consider a different question: not the division of authority between the Executive and the judiciary, to which Congress spoke in § 1252(a)(2), but the division of labor within the agency itself, governed by agency regulations set out in 8 C.F.R. § 1003.1(d)(3). And here, the default presumptions are reversed. Before 2002, the Board reviewed all parts of an immigration judge's decision

14

de novo; in 2002, amended regulations carved out an exception for findings of fact and credibility determinations, which now are reviewed only for clear error. *See Upatcha*, 849 F.3d at 184. Again, as with § 1252(a)(2), it was the *exception* that was to be construed narrowly, to apply "only to 'the specific findings of fact'" of immigration judges. *Id.* (quoting 67 Fed. Reg. at 54,890). With respect to mixed questions of law and fact, the agency made clear, the Board would defer to an immigration judge's factual findings but "retain [its] independent judgment and discretion . . . regarding . . . *application of the standard of law to those facts*." *Id.* (second alteration in original) (quoting 67 Fed. Reg. at 54,888).

Given this regulatory assignment of broad inter-agency review authority to the Board, *Turkson* properly characterized an immigration judge's determination under the first prong of the torture inquiry as a mixed question of law and fact, with the judge's application of law to fact subject to de novo review under 8 C.F.R. § 1003.1(d)(3). We do no more today than adopt the same reasoning and the same result with respect to an immigration judge's determination under the second, "acquiescence" prong of the very same torture inquiry. And *Saintha*, of course, continues to govern application of § 1252(a)(2)'s jurisdictional provisions.

Although we take this opportunity to explain our holding in some detail, we note that the government does not dispute its essentials, agreeing that *Turkson*'s hybrid standard of review applies in this case, as well. Instead, the government defends the decision here by arguing that the Board in fact *did* apply that hybrid standard, and did not, as Cruz-Quintanilla contends, treat the immigration judge's acquiescence

15

determination as a purely factual finding subject only to clear error review. We cannot agree. The Board's opinion is unambiguous on this point: After setting out Cruz-Quintanilla's position, the Board rejects it because "[Cruz-Quintanilla] has not established *clear error* in the Immigration Judge's *factual finding* that the Salvadoran government would not acquiesce in his torture." A.R. 3 (emphases added). The Board follows with a citation to *Saintha* for the proposition that "whether the government acquiesces in torture is a factual finding," and then concludes that it "discern[s] no clear error [in] the Immigration Judge's finding that the Salvadoran government does not acquiesce in torture." *Id*. A fair reading of the opinion leaves no doubt that the Board reviewed the immigration judge's acquiescence determination only for clear error, failing to bring to bear its "independent judgment," *Upatcha*, 849 F.3d at 184 (internal quotation marks omitted), as to whether the predictive facts found by the immigration judge satisfied the regulatory standard for government acquiescence.[2] Accordingly, we remand so that the Board may review the immigration judge's acquiescence determination under the correct standard of review.

_____

[2] As the government notes, the Board at the start of its opinion cites *Turkson* and its hybrid standard of review in affirming the immigration judge's ultimate conclusion that Cruz-Quintanilla is ineligible for relief under the Convention. A.R. 2–3. But that conclusion rests critically on the immigration judge's acquiescence determination, which the Board failed to subject to the requisite scrutiny. The Board, that is, affirmed the immigration judge's ultimate holding because and only because it "discern[ed] no clear error [in] the Immigration Judge's finding that the Salvadoran government does not acquiesce in torture." A.R. 3. On remand, the Board will have the opportunity to apply the correct standard of review to that crucial determination.

## III.

For the foregoing reasons, we dismiss in part and grant in part Cruz-Quintanilla's petition for review, and remand the case to the Board for further proceedings consistent with this opinion.

*PETITION FOR REVIEW DISMISSED IN PART AND GRANTED IN PART;*
*REMANDED FOR FURTHER PROCEEDINGS*