**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2423**

HOWARD EGBA DUNCAN, JR., a/k/a Duncan Egbaf, a/k/a Howard Duncan,

        Petitioner,

v.

WILLIAM P. BARR, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: November 1, 2018                    Decided: March 19, 2019

Before MOTZ, DUNCAN and QUATTLEBAUM, Circuit Judges.

Petition for review granted; remanded for further proceedings by published opinion. Judge Duncan wrote the opinion, in which Judge Motz and Judge Quattlebaum concurred.

**ARGUED:** Michael S. DePrince, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania, for Petitioner. Lindsay Donahue, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Anthony Vale, Kate A. Mahoney, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania, for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Kiley Kane, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

DUNCAN, Circuit Judge:

After submitting an unsuccessful application for a certificate of citizenship with the United States Customs and Immigration Services (the "USCIS"), Howard Egba Duncan, Jr. was placed in removal proceedings. Duncan applied for relief under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"), 8 C.F.R. § 1208.16(c), and also moved to terminate the proceedings on the basis that he had derived citizenship from his father under the Child Citizenship Act of 2000 (the "CCA"), 8 U.S.C. §§ 1431–33. The immigration judge (the "IJ") determined that Duncan had failed to demonstrate the requisite governmental acquiescence for relief under the CAT and that he had not derived citizenship under the CCA because he was not in the "physical custody" of his father during the requisite time period. The Board of Immigration Appeals (the "BIA") affirmed on both grounds, finding that the IJ did not clearly err in reaching either conclusion.

We are compelled to find that the BIA applied the wrong standard of review as to both determinations. Consistent with precedent established since the BIA's decision, we hold that whether the government would acquiesce to torture under the CAT is a mixed question of fact and law. Similar analysis persuades us that whether Duncan was in the "physical custody" of his father under the CCA is likewise a mixed question of fact and law. While the IJ's findings of fact are subject to clear error review, the application of those facts to the relevant legal standards constitute legal judgments subject to de novo review by the BIA. Accordingly, we grant the petition for review and remand to the BIA.

2

I.

Duncan is a legal permanent resident of the United States who was born in Nigeria to a Nigerian mother and an American father. When Duncan was six years old, he and his grandmother moved from Nigeria to the United States to live with Duncan's father. Duncan lived with his father and grandmother for three months before his father was incarcerated in April 1998. A few months later, Duncan's grandmother filed a petition to become Duncan's guardian, which was granted later that year. Duncan's father remained incarcerated until 2011, two years after Duncan's eighteenth birthday.

Throughout his father's incarceration, Duncan and his father had limited physical contact with one another; Duncan visited his father approximately once a month and the two talked on the phone several times a week. Though Duncan's father provided some financial support to Duncan and remained involved in certain aspects of his upbringing-- e.g., deciding where he went to school, what shoes his grandmother could purchase for him, and whether he would play football--Duncan's grandmother acted as his primary caretaker, driving him to and from school and providing him shelter, clothing, and consistent financial support.

Prior to the instant removal proceedings and before his eighteenth birthday, Duncan applied for a certificate of citizenship on July 14, 2009. His application was denied in March 2010. Duncan appealed the denial of his application, which the Administrative Appeals Office (the "AAO") affirmed in February 2015, finding that

3

Duncan failed to establish that he was in the "legal custody" or "physical custody" of his father because he did not reside with his father during the relevant period.[1]

After Duncan's appeal was denied, the government initiated removal proceedings against him pursuant to 8 U.S.C. § 1227(a)(2) based on his convictions for four crimes committed between October 2008 and January 2011. The government charged three grounds of removability: (1) his conviction of a crime of violence under 18 U.S.C. § 16, which was an aggravated felony; (2) his conviction of two crimes involving moral turpitude that did not arise from a single scheme; and (3) his conviction for a firearm offense.

Duncan moved to terminate the proceedings on the basis that he was not removable because he had derived citizenship through his father under the CCA. As a citizen, he would not be removable from the United States under § 1227(a)(2), which only applies to aliens. *Ojo v. Lynch*, 813 F.3d 533, 535 (4th Cir. 2016).

Under the CCA, a child born outside the United States automatically becomes a citizen where (1) the child has at least one parent that is a citizen of the United States, either by birth or naturalization; (2) the child is under eighteen years old; and (3) the child resides in the United States in the legal and physical custody of the citizen parent. 8 U.S.C. § 1431(a). Neither party disputed before the IJ that Duncan satisfies the first

---

[1] Neither party contends that the AAO's decision was binding or dispositive as to Duncan's derivative citizenship claim before the IJ, the BIA, or this court. Instead, as the IJ recognized in its decision, where a respondent is claiming derivative citizenship in removal proceedings and such claim "has reasonable support, it cannot be rejected arbitrarily." J.A. 180 (quoting *Matter of Tijerina-Villarreal*, 13 I&N Dec. 327, 331 (BIA 1969)).

4

two requirements. Rather, they disagreed as to whether Duncan was in the "legal custody" and "physical custody" of his father during the relevant period--from February 27, 2001, when the CCA was enacted, to October 17, 2009, when Duncan turned eighteen years old--given that his father was incarcerated. *See* 8 C.F.R. § 320.2 (providing that the requirements of the CCA must "have been met after February 26, 2001").

Following an evidentiary hearing at which Duncan and his father testified, the IJ determined that Duncan had not derived citizenship from his father because he was not in the "physical custody" of his father during the relevant period.[2] In reaching this conclusion, the IJ reasoned that Duncan was not in the physical care of his father and that his father did not personally supervise him or make day-to-day decisions over his welfare. The IJ did not address whether Duncan satisfied the legal custody requirement under § 1431(a). Consequently, the IJ held that Duncan was removable and denied his subsequent motion to reconsider.

In addition to his derivative citizenship claim, Duncan applied for cancellation of removal, which the IJ denied. Namely, the IJ found that because Duncan had been convicted of an aggravated felony, he was disqualified from receiving cancellation of removal.

---

[2] Neither party disputes that the IJ properly identified Maryland--where Duncan resided during the relevant period--as the state whose law governed the physical custody inquiry under the CCA.

5

Duncan also applied for relief under the CAT. Under the CAT's implementing regulations, relief is authorized when an individual demonstrates that it is more likely than not that "he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). To satisfy this standard, a petitioner is required to make two distinct showings. *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012) (citing 8 C.F.R. § 208.16(c)(2)). First, the petitioner must demonstrate that it is more likely than not that he will be tortured if removed. Second, the petitioner must show that such mistreatment "will occur at the hands of government or with the consent or acquiescence of government." *Id.* at 526. While the IJ found Duncan credible, the IJ denied him CAT relief on the basis that he had not met his burden of proving either that it was more likely than not that he would be tortured if removed to Nigeria or that such torture would be by or with the consent or acquiescence of public officials.

Duncan appealed the IJ's removal order to the BIA. In a single-member decision, the BIA dismissed his appeal. Affirming the IJ's determination that Duncan is ineligible for CAT relief, the BIA concluded that the IJ "did not clearly err in finding that the torture [Duncan] fears would not come at the hands of a public official or with the acquiescence of those officials."[3] J.A. 353. The BIA also found that the IJ "did not clearly err in finding that [Duncan's] father did not have physical custody of the respondent during the relevant time period" and affirmed the IJ's determination that

---

[3] The BIA declined to reach the IJ's determination that Duncan would not likely be subject to torture under the CAT.

Duncan did not derive citizenship from his father under the CCA. J.A. 351. Like the IJ, the BIA did not address whether Duncan was in the "legal custody" of his father during the relevant time period.[4] This appeal followed.

## II.

Duncan challenges the BIA's denial of his request for relief under the CAT and its rejection of his derivative citizenship claim. Specifically, he argues that the BIA applied the wrong standard of review when it affirmed both of the IJ's determinations, which the BIA concluded were pure questions of fact and accordingly reviewed for clear error. Whether the BIA has applied the proper standard of review is a question of law for purposes of our jurisdiction under 8 U.S.C. § 1252(a)(2)(D), which we review de novo. *Upatcha v. Sessions*, 849 F.3d 181, 184 (4th Cir. 2017).

For the reasons that follow, we conclude that the BIA incorrectly reviewed the IJ's determinations--government acquiescence under the CAT and "physical custody" under the CCA--for clear error. We therefore grant Duncan's petition for review and remand to

---

[4] Accordingly, we do not reach the question of whether Duncan was in the "legal custody" of his father during the relevant time period. On remand, however, depending on the BIA's determinations, it may be necessary for the BIA to address both whether Duncan was in his father's "physical custody" and "legal custody" pursuant to 8 U.S.C. § 1431(a).

7

the BIA for application of the correct standard of review.[5]  We address Duncan's claims under the CAT and the CCA in turn.

## A.

Duncan first argues that the BIA applied the wrong standard of review in affirming the IJ's determination that he is ineligible for relief under the CAT. Specifically, he argues that the BIA should have reviewed the IJ's determination de novo rather than for clear error.

We recently addressed this issue in *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884 (4th Cir. 2019), which binds us here.  There, we held that the government acquiescence determination under the CAT is a mixed question of fact and law and that an IJ's "determination that the evidence did not meet the relevant standard is a legal judgment subject to de novo review by the [BIA]." *Id.* at 885.

Here, neither party disputes that the BIA reviewed the IJ's determination that Duncan did not establish a likelihood of government acquiescence for clear error rather than de novo.  Accordingly, we remand Duncan's CAT claim so that the BIA may apply the correct standard of review.

---

[5] We therefore do not reach the question of whether one of Duncan's convictions constitutes an aggravated felony and, accordingly whether he is eligible for cancellation of removal, in light of the Supreme Court's ruling in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)--a question that the government concedes should be remanded to the BIA to consider, having declined to reach it previously.

## B.

Next, Duncan argues that the BIA applied the wrong standard of review in affirming the IJ's determination that he has not derived citizenship from his father under the CCA such that he cannot be removed. Namely, he contends that the BIA erred in applying clear error review to the question of whether he was in the "physical custody" of his father under the CCA. As this question is a matter of first impression before the court, we first address the relevant regulations dictating the BIA's standards of review of IJ decisions.

The BIA's review of an IJ's decisions is governed by 8 C.F.R. § 1003.1(d)(3). Prior to 2002, the regulations provided for de novo review by the BIA over all aspects of IJ decisions. Subsequently, however, new regulations established a standard of review under which the BIA reviews findings of fact for clear error. 8 C.F.R. § 1003.1(d)(3)(i). But the BIA reviews de novo "all other issues," *id.* § 1003.1(d)(3)(ii), "including, in cases involving mixed questions of law and fact, the application of the governing legal standard to the facts found by the immigration judge." *Cruz-Quintanilla*, 914 F.3d at 889 (internal citation omitted).

Guided by our precedent in similar contexts, we conclude that whether an individual was in the "physical custody" of a parent under the CCA is a mixed question of fact and law. We first review the analysis in those cases and then turn to the question of the applicability of that analysis to the physical custody determination under the CCA.

i.

9

Mixed questions of fact and law require a review of two determinations--what the facts were in a particular case, and the legal conclusions to which those facts lead. *Turkson*, 667 F.3d at 527. The IJ's determination of "what happened" is by its nature a factual finding giving rise to review for clear error by the BIA. *See Upatcha*, 849 F.3d at 185. But applying the relevant legal standard to those facts and deciding whether that standard was met is a legal judgment subject to de novo review. *Id.*

We have approached similar IJ determinations as a two-step inquiry, requiring the BIA to review an IJ's factual findings for clear error and its application of the appropriate legal standard de novo. In *Turkson v. Holder*, for example, we held that whether a petitioner would be subject to torture within the meaning of the CAT is a mixed question of fact and law. 667 F.3d at 529. The BIA reviews for clear error the IJ's factual findings as to what would happen to the petitioner upon removal. But the BIA reviews de novo the IJ's legal conclusion as to whether this future mistreatment amounts to "torture," which is "a term of art under the CAT . . . with a specific legal definition." *Id.* at 526, 530. Put another way, although the BIA defers to the IJ's findings of historical facts and the likelihood that they would occur in the future, the BIA "exercise[s] its independent judgment to evaluate . . . the legal significance of the facts" as well as "the ultimate conclusions to which those facts lead." *Id.* at 527. We later held that the same standard of review applies to the question of whether the government would acquiesce to such torture under the CAT, as discussed *supra*. *Cruz-Quintanilla*, 914 F.3d at 885.

Similarly, in *Upatcha* we held that whether a petitioner entered into a good faith marriage under 8 U.S.C. § 1186a(c)(4)(B) is a mixed question of fact and law. 849 F.3d

10

at 184; *see Massis v. Mukasey*, 549 F.3d 631, 636 n.6 (4th Cir. 2008) (explaining that the BIA reviews the IJ's factual findings of what happened to an individual for clear error, but reviews de novo the "application of the law to . . . facts--to determine, for example, whether those facts amount to 'exceptional and extremely unusual hardship'" (citation omitted). The IJ's factual determinations--such as the petitioner's credibility and the degree to which the couple's finances were intermingled--are subject to clear error review. In contrast, the IJ's ultimate legal judgment--determining whether the petitioner's marriage satisfies the good faith standard under 8 U.S.C. § 1186a(c)(4)(B)--is subject to de novo review. *Upatcha*, 849 F.3d at 185.

Applying these same analytical steps, as set out below, we conclude that whether a foreign-born child was in the "physical custody" of her citizen parent under the CCA is a mixed question of fact and law. It requires the IJ first to determine the specific, relevant facts of the parent-child relationship and then to assess, on the basis of those facts, whether the parent had "physical custody" over the child as a legal matter.[6]

ii.

The analytical steps that the IJ must take in determining whether a child was in the "physical custody" of her parent under the CCA underscore our conclusion that this determination is necessarily a mixed question. Under the CCA, a child born outside of

---

[6] We note that the Sixth Circuit has stated, without explaining, that "[t]he IJ's ruling that [the] petitioner . . . did not reside in his citizen father's physical custody at the time of his naturalization or at any time thereafter is a factual finding." *Karimijanaki v. Holder*, 579 F.3d 710, 721 (6th Cir. 2009).

11

the United States automatically becomes a citizen when, inter alia, the child is residing in the United States in the "physical custody of the citizen parent." 8 U.S.C. § 1431(a)(3). Congress has not defined "physical custody" in the CCA or its accompanying regulations. Rather, "it has long been a hallmark of our federalism principles that full authority over domestic-relations matters resides not in the national government, but in the several States." *Ojo*, 813 F.3d at 540 (citing *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890)).

In the absence of a federal definition, and because both the Supreme Court and our own cases look to state law to determine legal relationships in the family context, we turn to state law to determine the meaning of "physical custody" under the CCA. *See, e.g.*, *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956) (turning to state law to discern whether an illegitimate child is included within the term "children" as used in the Copyright Act, reasoning that "there is no federal law of domestic relations, which is primarily a matter of state concern").[7]

"Physical custody" under the CCA therefore presumptively means "physical custody" as defined under the law of the state in question--in this case, Maryland. Which state law governs the CCA's physical custody determination is significant because states

---

[7] Indeed, in the absence of a definition of the term "adoption" under the CCA, we have looked to state law instruments to determine when an individual was adopted for purposes of deriving citizenship under the statute. *Ojo*, 813 F.3d at 539–41 ("[I]f Congress had intended a modified definition of the term 'adopted' for purposes of federal immigration law and sought to place the interpretation thereof in the hands of an administrative agency, such as the BIA, Congress would have made that intention 'unmistakably clear.'") (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

have appeared to adopt different approaches to determining physical custody, and the same set of facts may result in different legal outcomes depending upon where they occur.

Accordingly, for the limited purpose of illustrating why the CCA's physical custody inquiry is necessarily a mixed question of fact and law, we find it helpful to contrast two states' approaches--that of Montana and Nevada. However, we clarify that in doing so, we take no position as to whether the physical presence of a parent is necessary for that parent to have physical custody of her child under either state's law, nor under the law of Maryland.

We begin with the example of the physical custody inquiry under Montana law. Montana recognizes that a parent's right to custody of her child "is a fundamental, constitutionally protected right." *Girard v. Williams*, 966 P.2d 1155, 1158–59 (Mont. 1998). Regarding physical custody in particular, the Montana Supreme Court has held that such custody "is not limited to having actual, immediate control of the physical presence of the child. Rather, this phrase relates to the custodial rights involved in the care and control of the child." *Henderson v. Henderson*, 568 P.2d 177, 179 (Mont. 1977). Indeed, that court has held that a parent who had been incarcerated for five years did not voluntarily relinquish his right to physical custody "when considered in conjunction with his actions to maintain contact with his children." *Girard*, 966 P.2d at 1164–65 (holding that nonparents lacked standing to pursue a custodial claim where they failed to show that the children were not in the physical custody of their parent).

13

In contrast, it appears that Nevada requires a parent to reside with a child as a component of physical custody. *See Rivero v. Rivero*, 216 P.3d 213, 222 (Nev. 2009) ("Physical custody involves the time that a child physically spends in the care of a parent. During this time, the child resides with the parent and that parent provides supervision for the child and makes the day-to-day decisions regarding the child.").

Consequently, the same facts may nonetheless lead an IJ to conclude that a parent has physical custody over her child under one state's laws but not another's. Take, for example, a child who resides with one parent during the school year and with the other during the summer vacation months. In Montana, it would appear that both parents retain physical custody over the child throughout the entire year. In other words, the parent with whom the child resides during the summer is not divested of her physical custody over the child during the school year, when the child resides with the other parent. *See In re Marriage of Susen*, 788 P.2d 332, 334 (Mont. 1990) (affirming an award of joint legal and physical custody where the parents live in separate states and the court imposed a summer and school year schedule). In contrast, in Nevada it appears that only the parent with whom the child physically resides at the time has custody of the child--meaning that the parent with whom the child resides in the summer has physical custody only during the summer. *See Bluestein v. Bluestein*, 345 P.3d 1044, 1048 (Nev. 2015) (observing that as a general matter, where a child resides with each parent "at least 40 percent of the

14

time, equal to at least 146 days over one calendar year, the parents share[] joint physical custody"); *Rivero*, 216 P.3d at 222.[8]

In sum, we conclude that the physical custody determination under the CCA requires a bifurcated approach. While the IJ's findings of fact are subject to clear error review, the IJ's application of the facts to the relevant state law in determining whether an individual satisfies the physical custody requirement under § 1431(a) is a legal judgment subject to de novo review by the BIA. Accordingly, we find that the BIA erred in reviewing for clear error the IJ's legal judgment as to whether, pursuant to Maryland law, Duncan satisfied the CCA's physical custody requirement. Because the BIA applied the wrong standard of review to this determination, we remand. Should the BIA resolve the physical custody determination in Duncan's favor, it must also address whether or not Duncan was in his father's "legal custody" as the statute so requires for purposes of derivative citizenship. 8 U.S.C. § 1431(a).

## III.

For the foregoing reasons, we grant Duncan's petition for review and remand the case to the BIA for further proceedings consistent with this opinion.

---

[8] We emphasize that we make no holding regarding the application of Montana or Nevada law to the CCA's physical custody requirement. Indeed, the tensions between state law defining custodial rights prospectively in context of divorce proceedings on the one hand, and the retroactive application of those definitions to evaluate parent-child relationships for purposes of the CCA on the other, may complicate any attempt to assess physical custody as a simple factual matter. However, we need not reach those issues here.

15

*PETITION FOR REVIEW GRANTED;*
*REMANDED FOR FURTHER PROCEEDINGS*