**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2377**

———————

JESUS ANTONIO PONCE-FLORES,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued:  December 6, 2022                          Decided:  September 6, 2023

———————

Before DIAZ, Chief Judge, and RUSHING and HEYTENS, Circuit Judges.

———————

Petition for review denied by published opinion.  Judge Rushing wrote the opinion, in which Chief Judge Diaz and Judge Heytens joined.

———————

**ARGUED:**  Gabriela Quercia Kahrl, UNIVERSITY OF MARYLAND FRANCIS KING CAREY SCHOOL OF LAW, Baltimore, Maryland, for Petitioner.  Sherease Rosalyn Pratt, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Maureen A. Sweeney, Brenda García, Norman Greenwell, Chacón Center for Immigrant Justice, UNIVERSITY OF MARYLAND FRANCIS KING CAREY SCHOOL OF LAW, Baltimore, Maryland, for Petitioner.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

RUSHING, Circuit Judge:

Jesus Ponce-Flores, a native and citizen of Honduras, petitions for review of an order of the Board of Immigration Appeals (Board) upholding the immigration judge's (IJ's) denial of his application for deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) and ordering him removed to Honduras. As a former member of the MS-13 gang, Ponce-Flores fears torture by gangs and police in Honduras. The IJ concluded that Ponce-Flores's risk of torture was substantial but he had not shown that a government official would more likely than not inflict or acquiesce in it. For the reasons explained below, we deny the petition.

I.

Ponce-Flores entered the United States without admission papers in July 2014, when he was fifteen years old. He allegedly was fleeing the MS-13 gang, to which he had belonged since the age of eight. In the United States, Ponce-Flores continued to associate with MS-13, was convicted of assault in the second degree, and pled guilty to participation in a criminal gang, with a resulting sentence of ten years in prison. While he was incarcerated, MS-13 members ordered Ponce-Flores to stab an inmate to prove his loyalty. He refused and sought protection from prison guards, officially breaking from MS-13. Upon renouncing his gang affiliation, Ponce-Flores was marked for death by the gang. MS-13 inmates stabbed him in the head and neck with broken glass, and he was transferred to another facility for protection.

2

The Department of Homeland Security initiated removal proceedings and served Ponce-Flores with a Notice to Appear in 2014. He failed to appear for a hearing and was ordered removed in absentia in 2016. The IJ subsequently granted his motion to reopen because Ponce-Flores had been in state custody at the time of his hearing. His case was re-calendared in 2019, and Ponce-Flores applied for deferral of removal under the CAT based on his fear of being tortured by gangs and police in Honduras. *See* 8 C.F.R. § 1208.17(a) (deferral of removal for aliens subject to mandatory denial of withholding of removal).

After considering documentary evidence and conducting a hearing at which Ponce-Flores and his expert testified, the IJ denied CAT relief and ordered Ponce-Flores removed to Honduras. In a thorough opinion, the IJ found that Ponce-Flores "faces a clear probability of being subject to the intentional infliction of severe physical or mental pain or suffering in Honduras." J.A. 69. Although his risk of torture "from police and vigilante groups appears minimal," his risk of torture "by MS-13 and Mara 18 [gang] members in Honduras is substantial." J.A. 69. As for government acquiescence, the IJ found that "[c]orruption within the police force in Honduras exists," so Ponce-Flores "does face a risk of severe harm with the consent or acquiescence of the government." J.A. 71. Yet considering the evidence as a whole, including significant efforts to eliminate police corruption in Honduras, the IJ determined that "police would probably meaningfully respond in some form—even if there is a chance that they would not and even if there is a chance that they would not be successful—to any report of torturous harm or threats against" Ponce-Flores. J.A. 71. The IJ therefore concluded, considering all risks in the

3

aggregate, that Ponce-Flores had not shown that he would more likely than not be tortured in Honduras "by or with the consent or acquiescence of a government official." J.A. 71.

The Board dismissed Ponce-Flores's appeal in a 2–1 decision. The Board rejected Ponce-Flores's assertions that the IJ had not considered or adequately addressed evidence about Honduran police corruption and collaboration with gangs, his expert's testimony, and statements in his affidavit. The dissenting Board member would have remanded to the IJ for further discussion of evidence regarding Honduran police turning former MS-13 members over to current MS-13 members for retribution.[1]

## II.

Ponce-Flores petitions our Court for review of the BIA's affirmance of the IJ's denial of his application for deferral of removal under the CAT. Where, as here, the Board "'adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions.'" *Nolasco v. Garland*, 7 F.4th 180, 186 (4th Cir. 2021) (quoting *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014)).

An applicant for CAT relief "bears the burden to prove that 'it is more likely than not that he will be tortured if removed' and 'that this torture will occur at the hands of government or with the consent or acquiescence of government.'" *Id.* at 190 (quoting *Martinez v. Holder*, 740 F.3d 902, 913–914 (4th Cir. 2014)); *see* 8 C.F.R. § 1208.16(c)(2).

---

[1] Specifically, the dissenting Board member identified two documents: the affidavits of Ponce-Flores and his expert. In his affidavit, Ponce-Flores said that, when he lived in Honduras, he heard of the police helping gangs find defectors and turning them over to the gang. In her affidavit, the expert stated that, in 2015, the Honduran government suspended 81 police officers who had collaborated with gangs by providing information about people the gangs were hunting.

Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "A public official acquiesces in torture if he or she is aware, either by actual knowledge or willful blindness, of the activity constituting torture beforehand and 'thereafter breach[es] his or her legal responsibility to intervene to prevent such activity.'" *Nolasco*, 7 F.4th at 190 (quoting 8 C.F.R. § 1208.18(a)(7)). When the applicant "claims a fear of torture from multiple entities, the agency must assess the likelihood of torture by aggregating the risk from all sources." *Id.* (citing *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019)).

The agency's factual findings—including its predictions about the likelihood of future mistreatment and government acquiescence—"are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 890 (4th Cir. 2019). Under this "highly deferential" standard, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), we review factual findings for substantial evidence, asking "whether the administrative record, considered as a whole, 'contains sufficien[t] evidence to support the agency's factual determinations,'" *Nolasco*, 7 F.4th at 186 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). We review legal conclusions, such as whether certain conduct satisfies the regulatory definition of torture or acquiescence, de novo. *Id.* And we review for abuse of discretion claims that the agency "failed to offer a reasoned explanation for its decision" or "distorted or

5

disregarded important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

A.

We first consider Ponce-Flores's claim that the IJ made two legal errors regarding the standard for government acquiescence in torture. Reviewing de novo, we find no error.

First, Ponce-Flores says the IJ "appeared to hold that, if a national government were to take steps of any kind to address corruption, that *necessarily* outweighs other evidence of acquiescence." Opening Br. 38. The record does not support Ponce-Flores's supposition. The IJ correctly acknowledged that the government acquiescence standard "draws no distinction between low-level and high-level officials." J.A. 65 (citing *Matter of O-F-A-S-*, 28 I. & N. Dec. 35, 41 (A.G. 2020)). Applying that standard, the IJ analyzed evidence documenting the problem of police corruption in Honduras, including reports of individual misconduct by low-level officials as well as systemic weaknesses. The IJ also acknowledged, however, the testimony of Ponce-Flores's expert that "only a 'minority' of officers are corrupt and colluding with gangs in Honduras" and that "the government undertakes significant efforts to address these issues." J.A. 70. The IJ further considered evidence that the Honduran government has dismissed thousands of allegedly corrupt police officers, restructured the police corps, and implemented other "successful interventions." J.A. 70. The IJ's opinion demonstrates that she weighed this competing evidence and determined that, despite the continuing existence of some corruption within the police force, police acquiescence in Ponce-Flores's torture—as "an individual who avers that he is no longer affiliated with a gang"—was not probable. J.A. 71. Nothing

indicates the IJ held, as a legal matter, that any steps by a national government to address corruption necessarily outweigh other evidence of acquiescence.

Second, Ponce-Flores claims the IJ incorrectly applied the "more likely than not" standard by relying on countrywide statistics and mathematical probabilities rather than assessing his individualized risk. The record again belies his assertion of error.

In articulating the legal standard and applying it to this case, the IJ correctly focused on the individualized risk to Ponce-Flores. For example, the IJ considered his status as an MS-13 defector, his tattoos, and the screening process he would likely face as a returning deportee. The IJ relied in part on testimony from Ponce-Flores's expert about how Honduran authorities would likely treat him in view of these circumstances, including her testimony that he "may not face any additional scrutiny at all or may be subject to further questioning" because of concerns about his potential gang affiliation. J.A. 68; *see also* J.A. 163, 171 (expert emphasizing the police officer's "discretion" in dealing with former gang members at reentry and the absence of any "pattern" in how such cases are handled).

The IJ's use of countrywide reports and statistics in part of her analysis doesn't reveal a legally erroneous standard. In assessing Ponce-Flores's chances of encountering a corrupt police officer who would acquiesce in his torture or an officer who would directly inflict torture on him, the IJ considered evidence demonstrating the relatively low number of police misconduct incidents compared to the large number of gang members operating in Honduras, as well as evidence addressing what proportion of Honduran police officers are corrupt or affiliated with gangs. That was not inappropriate. After all, we require immigration judges to make factual determinations predicting "what would likely happen"

to an alien if removed, including whether he will likely face harm amounting to torture and "how public officials will likely act in response to the harm [he] fears." *Cruz-Quintanilla*, 914 F.3d at 890 (internal quotation marks omitted). That often requires, as here, assessing the likelihood of multiple links in the predicted chain of events. And we cannot fault the IJ for considering the parties' numerical data in assessing the probability that Ponce-Flores will be tortured with government acquiescence; this Court itself has occasionally articulated the relevant standard as a matter of "adding the probability of torture from each entity and determining whether that sum exceeded 50%." *Rodriguez-Arias*, 915 F.3d at 973. We see no reason to think the IJ applied an incorrect legal standard.[2]

## B.

Ponce-Flores also contends that the IJ "'arbitrarily ignore[d] relevant evidence,'" thereby abusing her discretion. *Ibarra Chevez v. Garland*, 31 F.4th 279, 292 (4th Cir. 2022) (quoting *Rodriguez-Arias*, 915 F.3d at 974). "'We presume that, in reaching their conclusions, the IJ and the [Board] reviewed the evidence presented to them and made their decisions based on the relevant evidence.'" *Id.* (quoting *Nolasco*, 7 F.4th at 190). "'The [Board] and IJ are not required to discuss every piece of evidence in the record, but they

---

[2] We also reject Ponce-Flores's contention that the IJ applied an incorrect definition of torture. The IJ correctly stated the regulatory definition of torture early in her opinion and referenced it throughout. *See* 8 C.F.R. § 1208.18(a)(1). Ponce-Flores seizes on one sentence of the IJ's analysis in which she quotes his own expert saying that "'police would not cut [him] up and torture him.'" J.A. 69. Contrary to Ponce-Flores's assertion, the IJ did not use dismemberment as the benchmark for torture. For example, in the same discussion, the IJ explained that Ponce-Flores's expert "indicated a low chance of actual torture-like harm by the police," J.A. 68, and the IJ concluded that he faced a substantial risk of "intentional infliction of severe physical or mental pain or suffering," i.e., torture, at the hands of gang members in Honduras, J.A. 69.

must announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted.'" *Id.* (quoting *Nolasco*, 7 F.4th at 190). When the agency's "failure to engage with an applicant's evidence hampers our ability to meaningfully review what was decided below," remand is appropriate. *Rodriguez-Arias*, 915 F.3d at 974.

For his lead argument, Ponce-Flores contends the IJ *did* explicitly cite and describe important evidence but didn't "meaningfully engage with" this evidence when analyzing whether public officials would acquiesce in his torture. Opening Br. 18. To the contrary, the IJ plainly considered the evidence in her analysis—the very pages Ponce-Flores cites show as much. The IJ discussed, with detail, the "substantial reports documenting the problem of corruption amidst the Honduran government," including reports "that impunity is widespread, that security forces are frequently in cahoots with gangs, and that the police often lack resources to address all reports of threats or other problems with gangs." J.A. 70 (internal quotation marks omitted). Then the IJ described countervailing evidence in the record, weighed the competing evidence, and concluded that although some corruption still exists in the police force, the probability of a public official acquiescing in Ponce-Flores's torture was not more likely than not. Ponce-Flores thinks the IJ should have weighed the evidence differently, but "we do not reweigh the evidence on a petition for review." *Nolasco*, 7 F.4th at 191.

Ponce-Flores next identifies evidence he claims the IJ ignored. Some of this evidence the IJ specifically addressed in determining whether a public official or gang member would harm him, including Ponce-Flores's testimony and affidavit regarding his

9

past experiences with police in Honduras and evidence about his two gang tattoos, one of which he covered with other art but claimed may still be identifiable.[3]  Other documents he cites are about harm to children but, as the Board noted, Ponce-Flores is an adult and has not explained how this evidence is relevant to his claim.  As for the remaining documents he lists, they either bolster points the IJ acknowledged or lack any apparent connection to government acquiescence in torture.  For example, Ponce-Flores claims the IJ did not mention his testimony about police corruption in Honduras in her acquiescence analysis.  The IJ described that testimony in the factual background of her opinion.  But in her analysis, the IJ focused on other, more detailed, evidence supporting the same proposition.  The IJ is "not required to discuss every piece of evidence in the record." *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014), *as amended* (May 30, 2014).  None of Ponce-Flores's arguments "rebut the presumption that the agency considered th[e] evidence [he identifies] to the extent it was relevant." *Nolasco*, 7 F.4th at 191.

Finally, Ponce-Flores claims the IJ cherry-picked evidence to support her conclusions.  *See Ai Hua Chen*, 742 F.3d at 179 ("The [agency] may not selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach." (internal quotation marks omitted)).  Yet again we find his assertions unsupported.

Regarding efforts to combat corruption in Honduras, the IJ considered the conflicting evidence.  The IJ observed that the record contained substantial documentation

---

[3] The second tattoo, on his thigh, is less visible than the arm tattoo Ponce-Flores covered.

of governmental corruption, including reports of authorities accepting payments from gangs or participating in criminal activity themselves and reports that impunity is widespread. On the other hand, the IJ acknowledged reports of the government's efforts to eliminate corruption by restructuring police departments, renewing qualification programs, increasing forces, instituting mediators, and dismissing over 4,000 corrupt officers from the line of duty since 2016.

Likewise with Ponce-Flores's expert. Ponce-Flores highlights his favored portions of the expert's testimony but gives us no reason to think the IJ ignored them, especially in view of her extensive discussion of the expert's various opinions. For example, the IJ credited the expert's testimony about the high risk Ponce-Flores faces from MS-13 and Mara 18 members in Honduras and the low chance of torture-like harm by the police or vigilante groups. Regarding government acquiescence, the IJ relied on the expert's testimony that the government undertakes efforts to address corruption and yet "some members of the police" still collaborate with "some members of" the gangs, which could endanger Ponce-Flores and facilitate his torture by the gangs. J.A. 140. When the IJ inquired how pervasive this problem was, the expert responded that she "wouldn't say that it's general" and "would say that it's a minority within the police" and "once the Honduran government had found out, they have arrested these policemen and they've charged them." J.A. 140–141. This testimony from Ponce-Flores's own expert was important to assessing government acquiescence, and the IJ was entitled to rely on it.

And, contrary to Ponce-Flores's argument, the IJ also acknowledged the expert's various reasons for believing police would not make a "significant response" to Ponce-

11

Flores's reports of threats or torture. J.A. 70. While the IJ noted that one set of reasons the expert offered—lack of resources, enforcement priorities, and institutional weaknesses—does not amount to acquiescence, the IJ also addressed the other reasons the expert provided, including corruption and collusion with gangs. *See Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 219 (4th Cir. 2020) (government ineffectiveness does not show acquiescence).

In sum, Ponce-Flores has failed to show that the IJ arbitrarily ignored relevant evidence or otherwise abused her discretion. We require agency adjudicators to demonstrate that they "reviewed all [the applicant's] evidence, understood it, and had a cogent, articulable basis for [their] determination that [his] evidence was insufficient." *Portillo-Flores v. Garland*, 3 F.4th 615, 636 (4th Cir. 2021) (internal quotation marks omitted). The IJ surpassed that standard.[4]

C.

With all other issues settled, the ultimate question for review is whether substantial evidence supports the IJ's finding, affirmed by the Board, that Ponce-Flores has not shown it is more likely than not he will be tortured with the acquiescence of a public official if removed to Honduras. *See Nolasco*, 7 F.4th at 186. It does. Testimony from Ponce-Flores and his expert, numerous articles and country reports, along with other evidence cited by the IJ, support the factual determination that, although Ponce-Flores faces a "clear probability of being severely harmed in Honduras," it is not probable that he would be

---

[4] For similar reasons, we reject Ponce-Flores's argument that the IJ did not consider the "totality of the evidence." Opening Br. 41–45.

harmed by or with the acquiescence of a public official. J.A. 71. The record also contains contrary evidence, to be sure. But "[w]e may not reweigh the evidence." *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016). Because the record does not "compel[]" a contrary conclusion, we must uphold the agency's factual finding. 8 U.S.C. § 1252(b)(4)(B).

*PETITION FOR REVIEW DENIED*