**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-2290**

_____

MELVIN ISRAEL FUNEZ-ORTIZ,

        Petitioner,

v.

JAMES R. MCHENRY, III, Acting Attorney General,

        Respondent.

_____

On Petition for Review of an Order of the Board of Immigration Appeals.

_____

Argued:  December 10, 2024                    Decided:  February 4, 2025

_____

Before GREGORY and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

_____

Petition for review granted and remanded for further proceedings by published opinion. Senior Judge Keenan wrote the opinion, in which Judge Gregory and Judge Harris joined.

_____

**ARGUED:**  Amelia Christine Dagen, AMICA CENTER FOR IMMIGRANT RIGHTS, Washington, D.C., for Petitioner.  John Frederick Stanton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Peter Cameron Alfredson, Kendra Sofia Blandon, CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION, Washington, D.C., for Petitioner.  Brian Boynton, Principal Deputy Assistant Attorney General, Keith I. McManus, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent

BARBARA MILANO KEENAN, Senior Circuit Judge:

For nearly ten years, a Honduran gang conducted a campaign of terror and violence in Honduras against Petitioner Melvin Funez-Ortiz and his family. The gang murdered several of Funez's family members, shot Funez, and threatened to kill him and his relatives. To escape this violence, Funez fled to the United States, where immigration officials ultimately apprehended Funez and initiated removal proceedings against him. Funez applied for various forms of relief, including deferral of removal under the Convention Against Torture (the CAT).[1] After conducting a hearing, an immigration judge (IJ) granted Funez's application for deferral of removal under the CAT. The Board of Immigration Appeals (BIA) later reversed the IJ's decision.

Funez petitions for review of the BIA's decision. He contends that the BIA erred by (1) ignoring relevant evidence relating to the likelihood that Funez will be tortured if he is removed to Honduras, and by (2) engaging in improper factfinding about whether the Honduran government would acquiesce to gang torture of Funez upon his return to Honduras. After considering these arguments and the record before us, we grant Funez's petition and remand for further proceedings.

I.

Melvin Funez-Ortiz entered the United States with his son in 2018. Almost immediately, United States border patrol officers intercepted the pair. Immigration

---

[1] Funez also applied for asylum and withholding of removal, but as discussed *infra* p. 4, those applications are not at issue here.

2

authorities processed Funez and his son, releasing them into the United States subject to their appearance at an immigration hearing to determine whether they qualified for asylum or other relief. Before his asylum application was resolved, Funez was convicted of various offenses, including assault and battery, in Virginia state court. Funez was sentenced to a total of thirty days' imprisonment for these crimes. After Funez served his sentence, state prison officials transferred him to immigration authorities. He has remained in immigration custody since 2022.

## A.

The Department of Homeland Security (DHS) charged Funez as removable under 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen present in the United States who has not been admitted or paroled. Seeking to remain in the United States, Funez applied for asylum, withholding of removal, and deferral of removal under the CAT. In his application, Funez asserted that he feared harm from the Honduran gang, Los Chirizos (the gang).

The following facts were established in an evidentiary hearing held by the IJ. In 2010, Los Chirizos gang members (gang members) began targeting Funez's family. First, gang members attempted to extort Funez's brother, Pedro. After Pedro refused to comply with the gang's demands, gang members twice burned down Pedro's home. On the second occasion, the fire killed Pedro and left Pedro's wife permanently scarred. Gang members later kidnapped Funez's brother, Misael, and Misael's wife and daughter. Gang members raped Misael's wife and threatened to kill more members of the Funez family if anyone reported Pedro's death.

3

In 2012, Funez fled from his hometown of La Laguna to San Pedro Sula, a town in Honduras about seven hours away. Later that year, when Funez briefly returned to La Laguna to visit his parents, he encountered a Los Chirizos gang leader named Filax. During that encounter, Filax shot Funez in the leg. So, Funez, accompanied by other members of his family, went to the local police station and reported the shooting. When police officers went to Filax's home, the gang leader was not there. The police did not take any other action to follow up on Funez's report.

A short time later, Funez travelled back to San Pedro Sula with Misael. While they were travelling, they encountered other Los Chirizos gang members, who attacked the brothers and beat them until they lost consciousness. Funez still carries scars from that attack.

Around the same time, Filax confronted another one of Funez's brothers, Nehemias. Filax went to Nehemias' house in La Laguna and demanded to know why the police had come to the gang leader's home. Gang members also threatened and shot at another of Funez's brothers.

Gang members later discovered that Funez had filed a police report against Filax. In 2017, two gang members and one of their relatives, who wore a military police uniform (the man in uniform), went to the home of one of Funez's nephews. The three men stated that they were looking for Funez because he had filed a police report against Filax. The man in uniform told Funez's nephew that the Honduran military police fully supported the gang's plan to murder the Funez family members. After Funez's nephew refused to reveal Funez's location, the three men shot Funez's nephew in the arm and departed.

4

The same three men next visited Nehemias.  Again, they asked about Funez's location.  The three men forced Nehemias to his knees, put a gun in his mouth and another gun against his head, and demanded to know where they could find Funez.  Initially, Nehemias refused to answer.  But when the men tried to drown Nehemias in a bucket of water, he disclosed Funez's address in San Pedro Sula where Funez had been hiding for five years.  The three men told Nehemias that unless Funez came back to La Laguna immediately, they would kidnap Funez's eight-year-old son.

At that point, Funez and his son fled Honduras and came to the United States.  Nevertheless, the gang has continued to target Funez and his family.  Gang members twice have come to Funez's last known address in San Pedro Sula.  On the second occasion, they murdered one of Funez's nephews in the street.  Gang members also killed another of Funez's nephews in La Laguna.  And, after Funez was arrested in Virginia, gang members approached Funez's parents at their home in La Laguna and informed them that the gang was waiting for Funez to return to Honduras.

### B.

The IJ denied Funez's request for asylum and withholding of removal.[2]  But the IJ granted Funez's request for deferral of removal under the CAT, which requires a petitioner to show that, if removed, it is "more likely than not that" (1) "he or she would be tortured"[3]

---

[2] Funez did not appeal to the BIA the IJ's denial of his application for asylum and withholding of removal.  So those claims are not at issue in this appeal.

[3] "Torture" is a legal term.  By regulation, it "is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such (Continued)

5

(2) with the consent or acquiescence of the government, *see* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012). Relevant, but not dispositive, to this determination is the question whether the petitioner is able to "relocate to a part of the country of removal where" the petitioner "is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii).

In her decision, the IJ explained that Funez "established by a clear probability [that] he would be tortured or killed by, at the instigation of, or with the consent or acquiescence of a Honduran public official or one acting in an official capacity." In reaching this conclusion, the IJ emphasized that (1) Funez and his family have been harassed and attacked by the gang for years, (2) the gang's threats and violence intensified after Funez filed a police report, (3) the gang has continued to threaten Funez even after he left Honduras, and (4) the gang is awaiting Funez's return to Honduras. Based primarily on these findings, the IJ concluded that Funez would be unable to "relocate within Honduras to avoid torture or death." The IJ then determined that Funez was likely to be tortured if he returned to Honduras.

The IJ also found that the Honduran government would acquiesce to such future torture. The IJ emphasized that when gang members threatened one of Funez's nephews, one of the gang member's relatives was present wearing a military police uniform. The IJ

---

purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind." 8 C.F.R. § 1208.18(a)(1). Notably, the parties do not dispute that the past mistreatment alleged by Funez amounts to torture.

6

observed that the man in uniform stated that the gang "had the full support of the military police" to kill Funez's family members.  DHS appealed the IJ's decision to the BIA.

## C.

The BIA reversed the IJ's decision awarding Funez deferral of removal under the CAT.  The BIA first determined that the IJ's finding that Funez could not safely relocate to another part of Honduras was "clearly erroneous."  In support of its holding, the BIA observed that Funez "had safely relocated [to another town in Honduras] between 2012 and 2018."  However, the BIA did not discuss any other evidence regarding the gang's activities in Honduras after 2018, or how such activity might relate to Funez's ability to relocate safely in Honduras if he were removed.

Second, the BIA disagreed with the IJ's finding that Honduran officials would acquiesce in the future torture of Funez.  The BIA explained that it was "speculative" for the IJ to conclude that the man in uniform was "a member of the Honduran police acting under color of law."  Instead, the BIA indicated that the man in uniform was actually a gang member who possessed a military police uniform.  The BIA further noted that "the [IJ] did not consider that police had responded to multiple incidents involving" Funez. As a result, the BIA concluded that "[t]he record … does not support a finding that any risk of torture would occur by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity in Honduras."

Accordingly, the BIA sustained DHS's appeal and vacated the IJ's order granting Funez relief under the CAT.  The BIA further ordered that Funez be removed to Honduras.

7

Funez petitions this Court for review of the BIA's decision. He also filed a motion for a stay of removal pending appeal, which this Court granted.

## II.

In his petition for review, Funez makes two principal arguments.[4] First, Funez contends that the BIA abused its discretion by ignoring legally relevant evidence regarding the likelihood that he will be tortured if he is removed to Honduras. He asserts that the BIA improperly focused on Funez's successful relocation in the past, without addressing evidence of the gang's threats after 2018 and without considering whether he could relocate safely given those more recent threats. Second, Funez argues that the BIA improperly "found," without explanation, that the man in uniform "was not a military police officer, but a gang member in mere possession of a military police uniform."

We consider Funez's arguments in accord with the following principles. When, as here, the BIA reverses an immigration judge's decision and issues its own opinion without incorporating the IJ's decision, we review only the BIA's decision. *See Mena v. Lynch*, 820 F.3d 114, 116 (4th Cir. 2016). In the context of considering relief under the CAT, the BIA conducts "a two-step inquiry." *Duncan v. Barr*, 919 F.3d 209, 215 (4th Cir. 2019), *as amended* (Mar. 22, 2019). First, "the BIA reviews for clear error the IJ's factual findings" regarding what has happened in the past and "what will happen" to the petitioner if he is

---

[4] We have reviewed Funez's other arguments and the government's response to those arguments. Because we grant Funez's petition for review and remand his case for further proceedings on the grounds discussed below, we do not reach the parties' additional arguments.

removed, namely, whether the petitioner will be subject to future mistreatment with the support or acquiescence of the government. *Id.*; *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 890 (4th Cir. 2019), *overruled on other grounds by Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020). In conducting clear error review, the BIA may not reweigh evidence or "substitute[] its own judgment for that of the IJ." *Crespin-Valladares v. Holder*, 632 F.3d 117, 127–28 (4th Cir. 2011) (citation omitted). The BIA may reverse the IJ's factual findings only if the BIA is "left with the definite and firm conviction that a mistake has been made." *Wu Lin v. Lynch*, 813 F.3d 122, 126–27 (2d Cir. 2016) (citation omitted).

The BIA next reviews de novo the legal impact of the factual record. *Duncan*, 919 F.3d at 215. The BIA "'exercise[s] its independent judgment to evaluate'" (1) whether any likely "future mistreatment amounts to 'torture,'" *id.* (quoting *Turkson*, 667 F.3d at 526–30), and (2) whether the IJ's factual prediction about "'how public officials will likely act' qualifies as 'acquiescence,'" *Cruz-Quintanilla*, 914 F.3d at 890. Critically, the BIA commits legal error if it uses the wrong standard in reviewing the IJ's decision. *Turkson*, 667 F.3d at 528.

When the BIA has denied CAT relief initially granted by the IJ, our review generally is limited by the substantial evidence standard. *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014). We consider whether substantial evidence supports the BIA's conclusion that the IJ clearly erred in finding a likelihood of future torture in which the government acquiesces. *Id*. We will reverse the BIA's determination if the evidence compels a finding that it is more likely than not that the petitioner will be tortured with the government's acquiescence if removed. *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013).

9

In conducting our analysis, we typically "presume" that, in reaching its conclusions, the BIA reviewed the full record before it and based its decisions on the relevant evidence. *Nolasco v. Garland*, 7 F.4th 180, 190 (4th Cir. 2021) (citation omitted). Nonetheless, we must ensure that unrebutted, legally significant evidence is not arbitrarily ignored. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

We recognize that the BIA is "'not required to discuss every piece of evidence in the record,'" but its explanation must be sufficient to permit us to conclude that the BIA has fully considered the legally relevant evidence. *Nolasco*, 7 F.4th at 190 (quoting *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014)). The BIA abuses its discretion if it arbitrarily ignores legally relevant evidence. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019).

## A.

As stated above, Funez first argues that the BIA ignored legally relevant evidence when it determined that he failed to prove that he cannot relocate in Honduras without facing the likelihood of being tortured. According to Funez, the BIA disregarded evidence demonstrating the gang's "willingness and ability to hunt [ ] Funez across the country." He submits that the BIA focused only on his ability to relocate between 2012 and 2018 and failed to consider more recent evidence of the gang's threats toward Funez and his family.

In response, the government urges this Court to rely on a "presumption of regularity" to conclude that the BIA adequately considered all the evidence before it. The government argues that this "presumption applies unless the Board expressly states that it

did *not* consider certain evidence." As explained below, we agree with Funez's argument and conclude that the presumption of regularity is inapplicable here.

To determine whether a petitioner has met his burden to show that "it is more likely than not that an applicant would be tortured in the proposed country of removal," the BIA is required to consider "*all evidence* relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3) (emphasis added). This includes: (i) evidence of past torture, (ii) the applicant's ability to relocate within "the country of removal where he or she is not likely to be tortured," and (iii) evidence of "mass violations of human rights." *Id.* § 1208.16(c)(3)(i)–(iii). With regard to relocation, we have explained that a petitioner bears the burden of showing that safe relocation in the country "is not possible." *Suarez-Valenzuela*, 714 F.3d at 249.

Here, the BIA focused its analysis on Funez's move in 2012 from La Laguna to San Pedro Sula, seven hours away. The record demonstrates that the gang did not threaten or interact with Funez in San Pedro Sula, where Funez lived until 2018. Based on this fact alone, the BIA appears to conclude, but does not explicitly state, that Funez will be able to relocate safely somewhere in Honduras upon removal to that country.

But the BIA reached that apparent conclusion without considering legally relevant evidence. Funez presented evidence showing that the gang continued to threaten him even after he fled Honduras in 2018, and that gang members have stated that they are awaiting Funez's return to the country. Moreover, after Funez moved to the United States, gang members found and visited Funez's former home in San Pedro Sula and murdered one of

Funez's nephews in that city. This evidence, at a minimum, indicates that even if Funez previously was able to relocate safely, he may be unable to do so now.

The BIA never grappled with this significant evidence or even mentioned it. The BIA's failure to do so constitutes an abuse of discretion. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 255–56 (4th Cir. 2019) (concluding that the agency abused its discretion in not considering testimony that gang "members have continued to ask [the petitioner's] family about her whereabouts since she fled"). While the ability of a petitioner to relocate in the past provides some evidence that he might be able to relocate in the future, *see Ibarra Chevez v. Garland*, 31 F.4th 279, 293 (4th Cir. 2022), that fact is not dispositive when there is evidence that some party has tracked the petitioner's movements and has expressed a more recent intent to harm the petitioner, *see* 8 C.F.R. § 1208.16(c)(3) ("all evidence relevant to the possibility of future torture shall be considered."); *cf. Alvarez Lagos*, 927 F.3d at 256.

Our conclusion is not altered by the government's reliance on the presumption of regularity or an assumption that the BIA adequately considered the evidence before it. We decline to hold that such a "presumption applies unless the Board expressly states that it did *not* consider certain evidence." Resp. Br. 38. Instead, we have explained that a petitioner is "entitled to know that agency adjudicators reviewed all [the petitioner's] evidence, understood it, and had a cogent, articulable basis for its determination that [the petitioner's] evidence was insufficient." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (internal quotation marks and citation omitted). Thus, we routinely have determined that the BIA abuses its discretion when it arbitrarily ignores legally relevant information,

12

even when the BIA states that it reviewed the record. *See, e.g.*, *Alvarez Lagos*, 927 F.3d at 255–56 (reviewing *Alvarez Lagos*, A202-005-798 and A202-005-799, at 20 (BIA 2015)); *Portillo Flores v. Garland*, 3 F.4th 615, 636–37 (4th Cir. 2021) (en banc) (reviewing *Portillo Flores*, A208-553-679, at 3 (BIA 2019)) ("Both the IJ and BIA abdicated their responsibility to address Petitioner's evidence that he could not safely or effectively report the violence to the police.").

When an agency adjudicator disregards "credible, significant, and unrebutted evidence," that adjudicator must offer "specific, cogent reasons for doing so." *Portillo Flores*, 3 F.4th at 636 (internal quotation marks and citation omitted). Because the BIA ignored, without explanation, legally significant evidence regarding Funez's ability to relocate safely, we conclude that the BIA's failure to address that evidence constituted an abuse of discretion. *Rodriguez-Arias*, 915 F.3d at 974.

## B.

We next consider Funez's argument that the BIA improperly reweighed evidence when it considered whether the Honduran government would acquiesce to any future torture of Funez. Funez contends that the BIA reviewed the IJ's factual determinations de novo, rather than for clear error, when the BIA found that the man in uniform "was not a military police officer, but a gang member in mere possession of a military police uniform."

The government asserts in response that the BIA properly reviewed this fact under a clear error standard. Alternatively, the government submits that this Court could assume without deciding that the BIA applied clear error review because the evidence does not

13

compel the conclusion that a government official is likely to acquiesce in Funez's torture. We disagree with the government's position.

Under the CAT, a finding of torture requires certain "conduct 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (quoting 8 C.F.R. § 1208.18(a)(1)). "A public official acquiesces to torture if, 'prior to the activity constituting torture, [the official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity.'" *Id.* (alterations in original) (quoting 8 C.F.R. § 1208.18(a)(7)). Relevant to this "fact intensive" inquiry "is whether a law enforcement officer was on duty and in his official uniform at the time of his conduct." *Matter of O-F-A-S-*, 27 I. & N. Dec. 709, 716, 739 (BIA 2019).

In holding that the Honduran government would acquiesce to any future torture of Funez, the IJ emphasized that a gang member's relative, the man in uniform, accompanied the gang members to threaten Funez's family. Based on Funez's testimony and a declaration from Funez's relative, the IJ found that the man in uniform was a "military police officer." Further, the IJ determined that the man in uniform was "acting under color of law" when he told Funez's nephew that the Honduran military police fully supported the gang's plan to murder members of Funez's family.

The BIA, however, rejected these factual findings. The BIA explained that "it is speculative to conclude solely on the gang member's possession of a military police uniform that this individual was a member of the Honduran police acting under color of law." *Matter of J-G-R-*, 28 I & N Dec. 733, 738 (BIA 2023). In other words, the BIA

14

reconfigured the evidence to suggest that the man in uniform was a gang member who merely possessed a military uniform, not a government official acting under color of law. Additionally, in making that determination, the BIA completely failed to address the evidence that the man in uniform had stated that the Honduran military police fully supported the gang's plan to murder members of the Funez family.

As emphasized above, the BIA is prohibited from "engag[ing] in de novo review of findings of fact determined by an immigration judge." 8 C.F.R. § 1003.1(d)(3)(i). Instead, the BIA reviews the IJ's findings of fact for "clear error." *Id.* And, to find clear error, the BIA must firmly conclude that the record evidence compelled a different result. *Wu Lin*, 813 F.3d at 126–27. Here, the BIA did not point to any evidence in the record to support its rejection of the IJ's factual conclusion regarding whether the man in uniform was a military police officer acting under color of law.[5] Instead, the BIA reweighed the evidence and made its own finding.

We confronted a similar circumstance involving an improper application of a standard of review in *Turkson v. Holder*, 667 F.3d 523, 528 (4th Cir. 2012). There, we faulted the BIA for "redetermin[ing] the facts found by the IJ by applying its own de novo analysis of the facts in the record and according no deference to the IJ's findings." *Id.* In that case, the BIA had rejected witness testimony adopted by the IJ, reweighed evidence,

---

[5] The government argues that Funez's testimony supports the BIA's determination that the man in uniform was a gang member. But the BIA did not cite Funez's testimony in its decision. Moreover, Funez's testimony does not provide clear evidence that the man in uniform was a gang member, so his testimony does not affect our conclusion that the BIA engaged in reweighing the evidence. *See* 8 C.F.R. § 1003.1(d)(3)(i).

and discarded some of the IJ's factual conclusions. *Id.* We thus granted the petition for review, vacated the BIA's decision, and remanded the case for the BIA to apply the correct standard of review. *Id.* at 531.

The same outcome is required in the present case. In finding that the man in uniform was not a member of the military but was a gang member in "possession of a military police uniform," the BIA engaged in its own de novo review of the IJ's factual findings. This was legal error. The BIA did not provide a "cogent" reason for its rejection of the IJ's finding. *Orellana*, 925 F.3d at 152. Nor did the BIA rely on any aspect of the record in rejecting that finding. Therefore, because the BIA "simply substituted its own judgment for that of the IJ," *Crespin-Valladares*, 632 F.3d at 127–28 (citation omitted), we conclude that the BIA committed legal error, *Turkson*, 667 F.3d at 528. Under such circumstances, our precedent is clear. We must vacate the BIA's decision and remand the case for the BIA to apply the correct standard of review. *Crespin-Valladares*, 632 F.3d at 127–28. And, in view of this directive, we do not reach the question whether substantial evidence otherwise supports the BIA's determination that the man in uniform was not a government official acting under color of law.[6]

---

[6] We disagree with the government's assertion that this case is like others in which petitioners raised arguments about the standard of review only for the purpose of attacking the BIA's merits rulings. *See* Resp. Br. 36–37 (collecting cases). The cases cited by the government are inapposite to the case at hand. Funez is not using his argument regarding the standard of review merely to voice disagreement with the BIA's merits ruling. Rather, he has pointed to the BIA's de novo factfinding in which the Board found, contrary to the IJ's determination, that the man in uniform was a gang member rather than a Honduran military policeman.

16

III.

For these reasons, we grant Funez's petition for review, vacate the BIA's decision, and remand for the BIA to conduct proceedings consistent with this opinion. We further order that Funez's stay of removal be maintained during the pendency of the remand proceedings.

*PETITION FOR REVIEW GRANTED,*
*REMANDED FOR FURTHER PROCEEDINGS*