**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1253**

———————

JONATHAN ALEXANDER COLORADO NAVARRO,

      Petitioner,

   v.

PAMELA JO BONDI, Attorney General,

      Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued:  January 28, 2025                Decided:  July 31, 2025

———————

Before KING and RICHARDSON, Circuit Judges, and KEENAN, Senior Circuit Judge

———————

Denied by published opinion.  Judge Richardson wrote the opinion, in which Judge King and Senior Judge Keenan joined.

———————

**ARGUED:**  Eileen Patricia Blessinger, BLESSINGER LEGAL PLLC, Falls Church, Virginia, for Petitioner.  Stephanie Leigh Groff, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Joseph Moravec, BLESSINGER LEGAL PLLC, Falls Church, Virginia, for Petitioner.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Jennifer P. Levings, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

RICHARDSON, Circuit Judge:

Jonathan Alexander Colorado Navarro was a member of MS-13 who came to the United States after killing three people in El Salvador. He omitted this information on his first application for asylum, and his second application wasn't much more transparent. He provided more details in his third application, but only fully confessed to the murders and gang membership when he testified before an Immigration Judge. Despite these omissions and other lies, his Immigration Judge determined that he was credible. His Immigration Judge also found that he was likely to be tortured in El Salvador, based in part on his testimony but also on generalized data, and concluded that he qualified for protection under the Convention Against Torture. The Board of Immigration Appeals reversed these findings for clear error. Because substantial evidence supported the Board's determinations, and because his other arguments fail, we deny his petition for review.

## I.    Background

### A.    Factual Background

Colorado, as he calls himself, joined MS-13 in El Salvador when he was seventeen. He "beat[] people, st[ole], and participate[d] in other crimes." A.R. 182. He also murdered three members of the 18th Street Gang, a MS-13 rival. He was twice arrested in El Salvador for "illegal aggrupation," but was ultimately released each time. A Salvadoran Judge also issued three warrants for his arrest for aggravated homicide and for participating in a terrorist organization.

Colorado claims that he decided to leave MS-13 four years after the first murder. But the gang does not let its members leave freely. So, he claims, he fled to the United

2

States without permission from MS-13. Colorado claims that, as a result, MS-13 has since put out a greenlight for its members to kill him, and that he has received death threats since arriving in America.

In 2022, the Department of Homeland Security issued Colorado a Notice to Appear, charging him with being in the country illegally.

## B.    Procedural Background

At Colorado's initial immigration court hearing, he admitted he was in the country illegally and was therefore removable, but said that he would file for asylum and protection under the Convention Against Torture.  Since then, Colorado has gone through three asylum applications, several hearings before an Immigration Judge, and has lodged an appeal with the Board of Immigration Appeals.  We march through this in turn.

Colorado prepared his first application for asylum with the assistance of counsel. The paperwork stated that he had "recently learned false charges were brought against [him] in El Salvador" and that he "was falsely accused of being a member of the MS-13 gang."  A.R. 2010.  At a hearing, an IJ told Colorado to review the document and to have someone read it back to him in Spanish before the next hearing so that he would "be able to say yes [he] kn[ew] what's in it and that [he] had reviewed it."  A.R. 153.  At the following hearing, Colorado confirmed under oath that he "kn[e]w" what was "in that application" and that "it was read back to [him] in a language [he] underst[ood]."  A.R. 159.  The IJ also confirmed that Colorado understood he would be barred from receiving benefits if he knowingly filed an application with fabricated information.  The IJ then had

3

Colorado confirm again, "with that in mind," that he wanted to submit the application—he said "yes." A.R. 159–60.

Two days later, however, the Department of Homeland Security brought Colorado's Salvadoran arrest warrants for aggravated homicide and participating in a terrorist organization to the IJ's attention. So Colorado prepared and submitted a second asylum application in which he admitted that he had been a member of MS-13. He claimed that he had joined the gang to protect his sister and disclosed that he had been arrested twice. This second application included a thirteen-page affidavit detailing his personal background, but it did not mention committing murders.

Colorado submitted his third and final application for asylum a month later. In this application he stated:

> I have also engaged in activity during my time with MS-13. I do not wish to put that information into writing out of fear the Salvadoran government will obtain the written information if I am removed. I can orally disclose that information at my next hearing. I also believe my attorney proffered the information [previously].

A.R. 299.

His applications all having been submitted, Colorado finally got to a hearing on his application's merits. At the hearing, Colorado's counsel proffered to the court that he had "murdered someone in El Salvador." A.R. 176. Colorado then took the stand and admitted that he "participated in the murder of three" rival gang members. A.R. 184. On cross-examination, he conceded that he hadn't disclosed his MS-13 membership or that he had committed "any crimes" in his first asylum application. He conceded that in his second asylum application he had lied about committing "serious crimes." A.R. 213. And on

4

redirect, he contradicted his prior sworn statements that he hadn't reviewed the information in the first application and that he didn't know the application's contents before it was submitted to court.

After Colorado finished on the stand, Dr. Tommie Sue Montgomery was slated to testify next. She had written a report about Colorado's likelihood of torture in El Salvador, finding that Colorado faced "a 100 percent risk of torture or death" if he was returned to El Salvador. A.R. 8. But after Colorado testified, the IJ said that "this has got to end in 30 minutes," went off the record, and came back and told the parties it would grant Colorado protection under the CAT if he rested. A.R. 240–41. Colorado thus rested without calling Dr. Montgomery, though her written declaration remained in the record.

The Government continued to oppose CAT protection because Colorado had not shown that he was a credible witness and because Colorado hadn't shown it was likely that he would be tortured if returned to El Salvador.

As he had promised in the hearing, the IJ granted Colorado deferral of removal under the CAT. In particular, two findings are relevant. First, that Colorado's testimony was "generally credible." A.R. 103. It found Colorado's explanation that "he was afraid of officials in El Salvador possibly getting ahold of his application and seeing the admissions and raising additional scrutiny on him" to be "not unreasonable based on what is going on in the prisons of El Salvador." A.R. 103. The IJ also credited his explanation that "he was not aware of the contents of that original application when it was signed" to explain the inconsistencies in his applications. A.R. 104–05. Second, and without referencing Dr. Montgomery's document, the IJ determined that it was likely that Colorado

5

would be tortured if he was returned to El Salvador. This torture, the IJ found, would either occur at the hands of public officials or with the government's acquiescence. To reach this decision, the IJ relied on the likelihood of Colorado going to prison in El Salvador, Colorado's testimony about gangs greenlighting his murder, and generalized data about conditions in Salvadoran prisons.

The Government appealed these rulings to the Board of Immigration Appeals, and on review it found both to be clearly erroneous and reversed. First, given both lies and omissions in Colorado's testimony and asylum applications, the Board reversed the IJ's credibility determination. The Board also declined to accept Colorado's explanation of why he wasn't more forthcoming on his applications—it found that that since he had already been charged in El Salvador for the murders, disclosing the same information in his asylum application would not change his likelihood of being arrested. The Board further observed that Colorado's argument that he didn't know about the first application's contents was undercut by his previous sworn statement. Finally, the Board noted that Colorado argued on appeal that his omissions were "reasonable because any reasonable person would feel that a disclosure of committing murder . . . would make a judge more likely to deny their case." A.R. 6 (cleaned up). In other words, he admitted that his other purported reasons for his omissions were pretextual.

Second, the Board also reversed the IJ's likelihood of torture analysis. It found the IJ's statements about likelihood to be clearly erroneous because the data it cited did not establish a sufficient probability of torture. The Board also observed that the IJ didn't cite any evidence in its determination that MS-13 and the 18th Street Gang would torture him

6

in prison, concluding that the "bulk of the record" did not support that conclusion. A.R. 10. It further observed that the IJ "overlooked" El Salvador's "efforts to" improve prison conditions and "investigate complaints of human rights abuses." A.R. 10.

The Board rejected Colorado's counterarguments, which centered on Dr. Montgomery's written statement. The Board found that this "overreliance . . . [wa]s misplaced" because Montgomery hadn't testified at the hearing and "when given the opportunity" to call her, "the respondent waived the opportunity to do so." A.R. 8. Furthermore, the Board observed that the IJ didn't directly refer to any of Montgomery's testimony or evaluate her qualifications as an expert witness. And it noted that her statement was less probative because she hadn't testified and wasn't subject to cross-examination. Finally, neither party argued that the IJ erred by failing to reference her written statement or hear her testimony. Because of all this, the Board explained that it didn't need to address her expert qualifications or her written report directly.

The Board thus reversed the IJ and ordered Colorado removed. He timely appealed.

## II.    Discussion

Colorado argues that the Board erred in reversing the IJ's determination that he was entitled to protection under the CAT. Because this appeal turns on a stack of standards of review, we first detail how we evaluate the Board's review of IJ decisions. We next explain that substantial evidence supported the Board's findings that the IJ clearly erred. Finally,

7

we explain that Colorado's final claim was not exhausted and is therefore unreviewable. Because Colorado loses on all his theories, we deny his petition for review.

### A.      Legal Structure of Our Review of Board Determinations

This appeal involves nested review. We are reviewing the Board's review of the IJ's initial determinations.

Immigration Judges are tasked with making initial factual and legal determinations. "The [Board] reviews the IJ's legal conclusions *de novo*." *Martinez v. Holder*, 740 F.3d 902, 908 n.1 (4th Cir. 2014) (citing 8 C.F.R. § 1003.1(d)(3)). The Board "reviews the IJ's . . . factual conclusions for clear error." *Id.* Thus, an IJ's factual findings may be reversed only if the Board, upon review of the record, "is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

We review the Board's "legal conclusions, including the question of whether the Board has applied the proper standard of review, de novo." *Ibarra Chevez v. Garland*, 31 F.4th 279, 288 (4th Cir. 2022). We review the Board's review of the IJ's factual findings for "substantial evidence." *See Funez-Ortiz v. McHenry*, 127 F.4th 498, 505 (4th Cir. 2025). Thus, we will not reverse the Board's evaluation of the IJ's factfinding unless "any reasonable adjudicator would be compelled to conclude" the Board was wrong. 8 U.S.C. § 1252(b)(4)(B); *Garland v. Ming Dai*, 593 U.S. 357, 368 (2021). That is, we ask if the

evidence "*compels*" us to disagree with the Board. *Herrera-Alcala v. Garland*, 39 F.4th 233, 244 (4th Cir. 2022).[1]

In our review of the Board's review of the IJ's factual determinations, these standards fit together in the following way. We begin by checking *de novo* to ensure that the Board "applied" the proper standard of review—clear error. *Ibarra Chevez*, 31 F.4th at 288. Next, we ask "whether substantial evidence supports the Board's conclusion that the IJ clearly erred." *Funez-Ortiz*, 127 F.4th at 505. In other words, we ask "whether a reasonable mind might accept" the "evidentiary record as adequate to support" the Board's clear error determination. *See Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quotation omitted).

We are assured that the Board applied the clear error standard, *see* A.R. 4–6, so we ask whether substantial evidence supported those determinations.

### B.    Substantial Evidence Supports the Board's Clear Error Analysis of Colorado's CAT Eligibility

For an applicant to receive CAT relief, they must show it is "*more likely than not that [they] would be tortured if removed to the proposed country of removal.*" *Portillo Flores v. Garland*, 3 F.4th 615, 637 (4th Cir. 2021) (en banc) (emphasis added) (quotation

---

[1] As with any administrative decision, we assess the Board's stated explanations. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80 (1943). An agency may avail itself of reasons so long as they are "reasonably discernible" from its opinion. *Ming Dai*, 593 U.S. at 369. When the Board has "adopt[ed]" and "supplement[ed]" the IJ's opinion, we will review both decisions. *See Garcia Hernandez v. Garland*, 27 F.4th 263, 266 n.* (4th Cir. 2022). But where, as here, the Board reversed the IJ and issued its own opinion, we will not consider the IJ's work except to the extent that it is necessary to understand the Board's reasoning. *Id.*

omitted); 8 C.F.R. § 1208.16(c)(2). "Torture is defined as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Portillos Flores*, 3 F.4th at 637 (quoting 8 C.F.R. § 1208.18(a)(1)). This doesn't include "pain or suffering" that is "inherent in or incidental to lawful sanctions." § 1208.18(a)(3); *cf. Joshi v. Garland*, 112 F.4th 181, 190–91 (4th Cir. 2024).

The IJ made two key rulings below. First, that Colorado was a credible witness. Second, and in part based on Colorado's testimony, that he was likely to be tortured. The Board found that both determinations were clearly erroneous. We address whether substantial evidence supported each reversal in turn.

### 1. Substantial Evidence Supports the Board's Credibility Reversal

A fair bit of the evidence cited by the IJ centers around Colorado's testimony. Specifically, the IJ found Colorado to be a credible witness and relied on his representations that gangs had threatened to kill him and his family in finding that he was likely to be killed or tortured in El Salvador. The Board, however, discounted this evidence, finding that Colorado was clearly not credible.

Colorado argues that the Board erroneously reversed that decision. But the Board's reversal was based on major "inconsistenc[ies]" and "material" "omission[s]" in Colorado's applications for asylum, and in his testimony. *See Herrera-Martinez v.*

*Garland*, 22 F.4th 173, 186–87 (4th Cir. 2022). We find that substantial evidence supports its conclusion.

To start, Colorado's asylum applications omitted and obscured key information that would have been relevant to the asylum decision. His initial application did not admit any of the crimes he had committed in El Salvador. Instead, it said that he had "learned that false charges" had been brought against him and claimed that he was "falsely accused" of being a gang member. A.R. 2010. But once DHS filed his Salvadoran arrest warrants, Colorado filed a second application admitting gang membership and two arrests. Then, in his third application, he noted that he had "engaged in activity during my time with MS-13" and said that he would testify about these activities at his next hearing. A.R. 299. It was only then that he admitted he had committed three murders. Colorado's "intentional failure[s] to disclose highly probative and damaging facts" strongly supported the Board's credibility determination. *Ming Dai*, 593 U.S. at 370.

Colorado's own testimony further undermined his credibility. At an early hearing, the IJ directed Colorado to have someone read the application to him in Spanish to be sure he knew what was in the document. At the next hearing, Colorado affirmed under oath that: (1) the application had been read back to him; (2) he knew the contents of the application; (3) he understood the consequences of filing a fabricated application. But he contradicted these earlier sworn statements, while again under oath, at his merits hearing. Colorado also gave inconsistent explanations for his omissions, sometimes arguing that he feared for his life, and other times outright admitting he lied because he was worried it would harm his chances at asylum. "Inadequate explanations for contradictions" and

11

"internal[ly] inconsisten[t] testimony" strongly support finding an applicant lacks credibility. *Id.*

This trail of evasion, omission, and blatant fibs leaves us convinced that "substantial evidence supports the Board's conclusion that the IJ clearly erred" in its credibility determination. *Funez-Ortiz*, 127 F.4th at 505.

### 2. Substantial Evidence Supports the Board's Likelihood of Torture Reversal

The IJ determined that Colorado would likely be tortured if sent back to El Salvador. This involved two findings. First, based on his gang affiliation, outstanding warrants, and tattoos, that Colorado would likely end up in prison in El Salvador. Second, based on general prison conditions and Colorado's own speculation about gang hostility towards ex-members and members of rival gangs, that he would be tortured either by gangs or by Salvadoran officials if he ended up in prison.

The "IJ's prediction of future questions" like "[w]hat would likely happen if" he is removed and "how public officials" and others "w[ould] likely respond" were fact questions the Board was obligated to review for clear error. *Ibarra Chevez*, 31 F.4th at 291. The Board agreed Colorado was likely to end up in prison given his outstanding warrants in El Salvador. But after reviewing all the evidence in the record, the Board held that the IJ committed clear error in finding that Colorado demonstrated a sufficient likelihood of torture to be eligible for protection under the CAT. We find that substantial evidence supported that conclusion. *Funez-Ortiz*, 127 F.4th at 505.

12

We first address the likelihood of torture directly by the Salvadoran government. The IJ found that "hundreds" had been killed during clashes with the Salvadoran police in its "state of exception."[2] A.R. 108. Thus, the IJ concluded, Colorado was more likely than not to be killed by Salvadoran officials. But the evidence compels the opposite conclusion. It showed that out of 52,000 arrested during the first sixth months of El Salvador's state of exception, fewer than a hundred people had been killed in law enforcement operations and less than a hundred had died during detention. While any deaths are regrettable, this evidence does not show that it is likely that Colorado will face torture by the Salvadoran government.

Similarly, the evidence didn't establish that torture in prison was likely. The Board observed that the IJ "overlooked" El Salvador's "efforts to" improve prison conditions and "investigate complaints of human rights abuses." A.R. 10. And though it acknowledged that some of the data Colorado submitted showed that several detainees had been tortured, the Board concluded that the record evidence only established that 55 out of 95,000 detained persons showed signs of torture or reported being tortured. Less than one-tenth of one percent—.057 percent—is not "more likely than not.[3] While statistics alone don't

---

[2] This so-called "state of exception" is a period (beginning in 2022) where El Salvador "has implemented tougher security policies" and "in which Salvadoran security forces have cracked down on individuals suspected of being gang members . . . resulting in mass detentions." Leticia Chacon, Cong. Rsch. Serv., IN12510, *El Salvador's State of Exception and U.S. Interests* (2025).

[3] Colorado claims that the Board applied too high a standard of proof and forced Colorado to prove he would, in fact, be tortured. We do not agree. Colorado had the burden to prove he was "more likely than not" to be tortured. *Herrera-Alcala*, 39 F.4th at 252. The Board merely reversed the IJ for failing to hold him to that burden.

13

always reveal a petitioner's full risk of torture,, *see Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 975 (4th Cir. 2019) these statistics provide substantial evidence on this record to support the BIA on the likelihood of torture in prison, *see Ponce-Flores v. Garland*, 80 F.4th 480, 485 (4th Cir. 2023).

Next we address the likelihood of torture by gangs. The IJ concluded that gangs were more likely than not to torture Colorado in prison with the acquiescence of Salvadoran authorities. But as the Board observed, this section of the IJ's opinion lacks any citations to "documentary evidence." A.R. 10. It also found that "the bulk of the record" did "not substantiate" that conclusion. *Id.* The IJ did cite Colorado's testimony, but the Board understandably discounted that testimony based on its finding that Colorado was not credible. Given this dearth of evidence, it is no surprise that the IJ's findings were rejected for clear error.

Colorado also claims that the Board erred in its CAT determination by not considering Dr. Montgomery's written statement that Colorado was "100 percent" likely to be tortured in El Salvador. A.R. 8. We reject the premise—the Board considered, but rejected, this evidence. First, the Board noted that "Dr. Montgomery never testified at the hearing," and that "when given the opportunity to call her, [Colorado] waived the opportunity to do so." A.R. 8. Moreover, it noted, "the Immigration Judge did not explicitly incorporate or adopt any portion of Dr. Montgomery's witness statement, or otherwise qualify her as an expert witness." *Id.* As a result, the Board determined that it "need not address the contents of her witness statement further," nor did it need to "evaluate her qualifications . . . in the first instance." A.R. 8. Far from failing to consider Dr.

14

Montgomery's statement, the Board reasonably determined that all of this "render[ed] her statement considerably less probative and limit[ed] [its] review of" it.  A.R. 9 n.6.

The IJ's decision was based on generalized (and facially insufficient) statistics, and on Colorado's speculation.  Moreover, it ignored contrary evidence.  Clear error review is not no review—we find that substantial evidence supports the Board's conclusion that the IJ clearly erred in its likelihood of torture analysis.[4]

### C.    The Claim That the Board Should Have Remanded Was Not Exhausted

Before the IJ, Colorado declined to call Dr. Montogomery to the witness stand.  He chose to do that because the IJ made it clear that he was going to win.  Colorado contends that the Board should have remanded the case to the IJ to take that testimony.  But on appeal to the Board, Colorado did not "argue[] that the exclusion of [Dr. Montgomery's] testimony below, or omissions of discussion of her witness statement in the [IJ's] decision" was "an error requiring remand."  A.R. 8–9.  And "if an alien could have raised an argument before the Board but didn't, we do not have the authority to consider the argument in the first instance."  *Shaw v. Sessions*, 898 F.3d 448, 456 (4th Cir. 2018) (citing 8 U.S.C. § 1252(d)(1)).  Because to "fail to raise a legal theory before the Board is to abandon that theory," we have no ability to entertain Colorado's argument now.  *Id.*

---

[4] Colorado also argues that the Board engaged in appellate fact-finding and thus exceeded its authority when it reversed the IJ's likelihood of torture analysis.  We disagree—on clear error review "the BIA . . . [has] the ability to directly override the IJ's factfindings."  *Ming Dai*, 593 U.S. at 367.

15

\*          \*          \*

The Immigration Judge below found that that Colorado was likely to be tortured in El Salvador. The Board found that determination was clearly erroneous. Substantial evidence supported the Board's clear error finding that Colorado was not a credible witness, and it therefore properly discounted his testimony about likely torture by gang members. Substantial evidence also supported the Board's finding that other pieces of information did not show support that he was likely to be tortured. Finally, because he did not raise it below, Colorado's claim that the Board legally erred by failing to remand this case for the IJ to take further testimony is unreviewable. Colorado's petition is

*DENIED.*

16