**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 25-1119**

———————————

GLENDA ALVARADO-PAZ; J.P.A.,

        Petitioners,

   v.

TODD BLANCHE, Acting Attorney General,

        Respondent.

———————————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————————

Argued:  March 17, 2026                            Decided:  June 1, 2026

———————————

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

———————————

Petition for review granted in part and denied in part; vacated and remanded by published opinion.  Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

———————————

**ARGUED:**  Brendan Halvor Ekern Connors, HOLLAND & KNIGHT, LLP, Washington, D.C., for Petitioners.  Linda Y. Cheng, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Zachary P. Lundgren, HOLLAND AND KNIGHT LLP, Washington, D.C., for Petitioners.  Brett A. Shumate, Assistant Attorney General, Matthew B. George, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————————

AGEE, Circuit Judge:

Glenda Alvarado-Paz and her minor child, J.P.A., petition for review of the Board of Immigration Appeals' final order of removal based on the denial of their application for asylum and withholding of removal under the Immigration & Nationality Act ("INA") and withholding of removal under the Convention Against Torture ("CAT"). For the reasons below, we grant the petition in part and deny it in part, vacate the agency's removal order, and remand for further proceedings consistent with this opinion.

I.

The record developed before the immigration judge shows that Alvarado-Paz, a native and citizen of El Salvador, fled to the United States in 2016 after her father, Fabian Alvarado Parada ("Fabian"), threatened to kill her. Alvarado-Paz testified that Fabian is extremely violent, having physically and psychologically abused her and her immediate family, which included her mother, Porfiria Paz Martinez ("Porfiria"), and six siblings. Fabian was especially violent toward Porfiria, beating her regularly and putting a machete to her throat as he threatened to kill her and her children. After Porfiria inherited land from her family, Fabian threatened more violence to secure her agreement to deed the property to him. Porfiria also witnessed Fabian kill his stepfather with a machete, after which he threatened to kill her if she told anyone.

Fabian wasn't the only violent member of the family. In June 2016, Fabian's foster brother murdered Porfiria, shooting her at her home while she was caring for J.P.A. and another child. When Alvarado-Paz learned of her mother's death, she went to Porfiria's

2

home, where law enforcement and Fabian were already on scene. Alvarado-Paz accused Fabian of ordering his foster brother to kill her mother. Fabian told her to be quiet and "grabbed his machete," which Alvarado-Paz understood to mean that he "was capable of killing me at that moment" "even though there were a lot of cops there." J.A. 148. In the days following her mother's death, Alvarado-Paz and her siblings told law enforcement about Fabian's history of abuse and violence, as well as their mutual belief that he was responsible for Porfiria's murder. J.P.A.—who was four years old when she witnessed the murder—identified Fabian's foster brother as the person who murdered Porfiria in a photo lineup, but the police informed Alvarado-Paz that they couldn't rely on that identification because of J.P.A.'s age. Despite these repeated accusations against Fabian and his foster brother, law enforcement didn't formally interview either man about Porfiria's murder.

About two weeks after her mother's death, Alvarado-Paz was approached by two unknown masked men as she was traveling to visit her mother's grave. The men threatened to kill Alvarado-Paz if she continued investigating her mother's death. Although she couldn't recognize the men, she believed they were connected to her father because he "always said that he had a lot of friends, and that for $20 they would do whatever he wanted." J.A. 153.

Feeling "trapped" and fearing her father's threats, Alvarado-Paz fled El Salvador with J.P.A. J.A. 154. After they entered the United States without inspection, Alvarado-Paz and J.P.A. were charged as removable and ordered to appear for related proceedings.

3

Alvarado-Paz conceded removability but applied for asylum and withholding of removal under the INA and withholding of removal under the CAT. J.P.A. was named as a derivative asylum applicant.[1]

Alvarado-Paz claimed eligibility for asylum and withholding under the INA based on her past persecution and fear of future persecution arising from both her political opinion ("opposition to violence [] in favor of the rule of law in El Salvador") and her membership in four alleged particular social groups ("PSGs"): (1) "females viewed as property by virtue [of] their status in a family relationship"; (2) "Salvadoran women"; (3) "nuclear family of Porfiria Paz"; and (4) "family members of prosecutorial witnesses." J.A. 200. Her request for relief under the CAT rested on the death threats she received following her mother's murder.

After a hearing at which Alvarado-Paz testified and submitted documentary evidence in support of her claims, the IJ found Alvarado-Paz to be credible, and accepted the above-recounted facts as true. Even so, it denied all forms of relief.

As for Alvarado-Paz's claims based on her political opinion, the IJ found that even if opposing violence in favor of the rule of law qualifies as a protected political opinion, Alvarado-Paz "failed to establish she holds such a political opinion." J.A. 86. In short, it found that seeking police intervention related to the death of her mother didn't "establish that [Alvarado-Paz] holds an anti-violence, pro-rule of law political opinion." J.A. 87. The IJ further determined that there was no evidence that Fabian would target her on account

---

[1] Because J.PA.'s application depends on Alvarado-Paz's, we do not separately analyze it. *See* 8 U.S.C. § 1158(b)(3)(A).

4

of that political opinion because his motives were personal—to avoid being implicated in Porfiria's murder—not political.

The IJ was equally unpersuaded by Alvarado-Paz's claims based on membership in any of the proposed PSGs. It first concluded that Alvarado-Paz hadn't established a nexus between any persecution and membership in the groups "females viewed as property by virtue of their status in the family relationship" and "Salvadoran women." *See* J.A. 84–85 & n.1. Indeed, it determined that the record didn't establish persecution on account of her gender at all. Instead, it noted that Fabian had been abusive toward both male and female members of his family, as evidenced by Alvarado-Paz's testimony that Fabian had been particularly brutal toward her brother. The IJ further observed that Alvarado-Paz had testified that her father's death threats occurred because she'd accused him of murdering her mother and because she was related to him, not because she was a female or a "female[] viewed as property by virtue of [her] status in the family." J.A. 84; *see* J.A. 84–85.

The IJ next turned to Alvarado-Paz's proposed PSG of the "nuclear family of Porfiria Paz." And once again, the IJ concluded that the record didn't demonstrate a nexus between membership in that group and any persecution. Pointing to caselaw from this Court and the BIA, the IJ observed that a nexus requires more than the existence of the named group and harm; rather, it requires proof that the persecutor targeted the applicant on account of the protected characteristic. Relevant to its decision, the IJ determined that the record suggested Fabian used "violence to exert extreme control over his entire family"—not that he did so to inflict harm on Porfiria. J.A. 85; *see also* J.A. 86 ("Although despicable, Mr. Alvarado's abuse of his children does not appear to be an explicit attempt

5

to inflict further psychological violence against Ms. Paz."). In the IJ's view, Alvarado-Paz also hadn't shown that her familial relationship to her mother would be "at least one central reason [her father] would subject her to future persecution" if she returned to El Salvador. J.A. 86. Instead, the IJ concluded that, based on the record, the sole reason Alvarado-Paz had been threatened appeared to be her public accusations that her father killed her mother. "[R]evenge, rather than [Alvarado-Paz's] relationship to [her mother], motivated [her father] to target her." *Id.* Accordingly, the IJ concluded that the record didn't demonstrate the requisite nexus to support this claim.

The IJ also determined that Alvarado-Paz couldn't base her claims on a proposed PSG of "family members of prosecutorial witnesses" because neither she nor J.P.A. had ever acted as a prosecutorial witness against Porfiria's murderer. *Id.* Although J.P.A. identified Fabian's foster brother as the murderer in a photo lineup, police indicated they couldn't use those statements because J.P.A. was too young. Indeed, the record indicated that police didn't view that man as a suspect and had never arrested him nor prosecuted him for the offense. On this record, the IJ determined that Alvarado-Paz simply wasn't a member of this proposed PSG.

Because Alvarado-Paz couldn't show persecution on account of a protected ground, the IJ denied her applications for asylum and withholding of removal under the INA.

Last, the IJ reviewed and denied Alvarado-Paz's application for relief under the CAT based on its determination that she hadn't shown government "acquiesce[nce] to her feared torture." J.A. 87. The IJ didn't view law enforcement's failure to prosecute anyone for Porfiria's murder as sufficient proof that Salvadoran public officials would acquiesce

6

to Alvarado-Paz's feared torture. It noted that the investigation remained open and that they had pursued some investigative steps after the murder. Because Alvarado-Paz pointed to no other basis for establishing her claim, the IJ denied relief.

Alvarado-Paz appealed to the BIA and, in a single-judge decision, the BIA dismissed the appeal. After stating that it "adopt[ed] and affirm[ed]" the IJ's decision to deny Alvarado-Paz's applications, the BIA indicated it was "not persuaded" by her arguments that the IJ misapplied the law or ignored evidence supporting her applications. J.A. 8. With respect to her claims based on membership in a PSG, the BIA stated that Alvarado-Paz challenged the IJ's decision to reject her claims based on "membership in [] three proposed social groups, to which she additionally adds on appeal as 'Salvadoran woman,' and 'family members of witnesses to crime.'" *Id.* The BIA agreed that Alvarado-Paz hadn't shown reversible error on the requisite nexus between her past persecution or fear of future persecution, on the one hand, and her preserved PSGs, on the other hand. The BIA also found "no reason to address" the merits of the two PSGs it determined that Alvarado-Paz was asserting "on appeal in the first instance" because she hadn't pursued those claims before the IJ. J.A. 9. Last, the BIA rejected Alvarado-Paz's arguments with respect to her CAT claim, concluding that the record showed no reversible error in the IJ's determination that she didn't meet her burden with respect to the Salvadoran government instigating, consenting, or acquiescing to her being tortured.

Alvarado-Paz petitioned for review of the agency's final order of removal, and the Court has jurisdiction under 8 U.S.C. § 1252.

7

II.

Alvarado-Paz first challenges the agency's decision to deny asylum and withholding of removal under the INA. Although they are ultimately governed by different standards, both forms of relief share the common requirement that the applicant demonstrate persecution "on account of" or "because of" a protected ground. *Compare* 8 U.S.C. § 1101(a)(42), *with* § 1231(b)(3)(A). Relevant to this case, one protected ground is the applicant's "political opinion" and another is her "membership in a particular social group." § 1101(a)(42); § 1231(b)(3)(A).

The causation requirement, or "nexus" determination, requires an applicant to demonstrate that her protected ground is "at least one central reason for" her feared persecution. *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 (4th Cir. 2019) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). This means the protected ground "cannot be 'incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (cleaned up). But it also means the protected ground needn't be the "sole or dominant motivation for her persecution." *Cruz v. Sessions*, 853 F.3d 122, 127 (4th Cir. 2017); *id.* at 128 ("[M]ore than one central reason may, and often does, motivate a persecutor's actions.").

We review legal questions de novo and factual determinations for substantial evidence. *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). Review for substantial evidence means that the agency's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. § 1252(b)(4)(B). What's more, the agency's decision whether to grant relief is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

8

The agency abuses its discretion if it "fails to offer a reasoned explanation for its decision," *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (quoting *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014)), "distorts or disregards important aspects of an applicant's claim," *id.* (quoting *Cordova*, 759 F.3d at 337), or "ignore[s] legally significant evidence and base[s] [its] decision on only isolated portions of the record," *Arita-Deras v. Wilkinson*, 990 F.3d 350, 356 (4th Cir. 2021). Under this standard, "[e]ven if the record plausibly could support two results: the one the [agency] chose and the one the petitioner advances, reversal is only appropriate where the [C]ourt finds that the evidence not only supports the opposite conclusion, but *compels* it." *Mulyani v. Holder*, 771 F.3d 190, 197 (4th Cir. 2014) (cleaned up).

## A.

Alvarado-Paz first asserts that the BIA mistakenly deemed her to have raised two PSGs for the first time on appeal: "Salvadoran women" and "family members of witnesses to crime." That error, she maintains, led the BIA to erroneously decline to consider the merits of her arguments regarding these PSGs as part of its review of the IJ's decision. She argues that this error requires reversal because the agency must properly characterize the basis for an applicant's claims when assessing whether to grant relief.

## 1.

Having reviewed the record, we agree with Alvarado-Paz that the BIA committed reversible error when it erroneously stated that she hadn't proffered the PSG of Salvadoran women before the IJ and then relied on that error as the basis for not considering her merits arguments relating to this PSG. As we have recognized, "[t]he BIA abuses its discretion if

9

it . . . distorts or disregards important aspects of [an] applicant's claim." *Cordova*, 759 F.3d at 337 (cleaned up). Here, it is undisputed that Alvarado-Paz proffered the PSG of Salvadoran women in her filings before the IJ, and that the IJ considered this PSG and rejected it on the merits.[2] The BIA thus abused its discretion by thrice misrepresenting that Alvarado-Paz hadn't raised the PSG Salvadoran women before the IJ and was instead pursuing it for the first time on agency appeal. *See* J.A. 8–9.

The parties dispute whether this error matters in adjudicating Alvarado-Paz's petition for review. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (explaining that "[h]armless-error analysis applies in immigration cases"). But we start from the premise that an error of this kind generally requires remand. *See Cordova*, 759 F.3d at 338 ("[T]he process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained[, and] when a BIA order does not demonstrate that the agency has considered an issue, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (cleaned up)); *see also Oliva v. Lynch*, 807 F.3d 53, 61 (4th Cir. 2015) ("Because the BIA order here fails to show that the agency adequately considered the issue, we remand.").

---

[2] For his part, the Attorney General acknowledges this error, but asserts it is harmless because (1) the BIA adopted the IJ's decision (which considered this PSG) and (2) the BIA expressly agreed with the IJ's merits analysis with respect to another PSG that factored in Alvarado-Paz's sex ("females viewed as property by virtue of their status in the family relationship").

To be sure, remand isn't required when an error "clearly had no bearing on the procedure used or the substance of the decision reached." *Ngarurih*, 371 F.3d at 190 n.8 (quoting *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964)). But we have no such assurance here and thus don't depart from our usual course.

First, the BIA's misapprehension about the posture of Alvarado-Paz's proposed PSG "Salvadoran women" led it to refuse to consider the merits of her arguments relating to this PSG. J.A. 9 ("We find no reason to address the respondent's claims about [this] group[] that [is] raised on appeal in the first instance."). This factual error led the BIA to incorrectly apply legal principles of forfeiture to resolve the portion of Alvarado-Paz's application based on her membership in the proposed PSG Salvadoran women. *Accord Funez-Ortiz v. McHenry*, 127 F.4th 498, 505 (4th Cir. 2025) ("[T]he BIA commits legal error if it uses the wrong standard in reviewing the IJ's decision."). That decision denied Alvarado-Paz a merits-based agency appellate review of the IJ's adjudication of this claim. This fact counsels in favor of remand.

Second, the BIA's purported adoption and affirmance of the IJ's decision offers no basis for declaring this error harmless. Put simply, because the BIA didn't believe that the IJ had considered the PSG Salvadoran women at all, it would be illogical to read the BIA's decision as adopting and affirming anything the IJ had to say about that claim. Far from suggesting harmlessness, as the Attorney General suggests, this inconsistency in the BIA's decision supports remand. *See Cordova*, 759 F.3d at 338.

Third, we routinely remand for reconsideration when the IJ or the BIA (or both) mischaracterize an applicant's proposed PSG, and since that's the type of error that

11

occurred here, this too counsels in favor of remand. *E.g.*, *Quintero v. Garland*, 998 F.3d 612, 643 (4th Cir. 2021) (remanding to the BIA for reassessment after the BIA failed to properly characterize the applicant's proposed protected grounds); *Alvarez Lagos v. Barr*, 927 F.3d 236, 253 (4th Cir. 2019) (labeling the IJ's mischaracterization of a proposed PSG a "critical legal error" that the BIA failed to correct on its review and remanding for assessment of the applicant's proposed PSG); *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (remanding for reassessment after the BIA committed "legal error" by rejecting the claim based on review of a PSG that differed from the one the applicant proposed). Thus, the BIA's consideration of a *different* PSG from the one an applicant actually proposes constitutes legal error generally requiring remand.

Last, we acknowledge that the BIA rejected on the merits a *different* PSG that may overlap in some respects with the one it mistakenly believed to have been raised for the first time before it. But we aren't convinced that the PSG "females viewed as property by virtue of their status in a family relationship"—which the BIA rejected on the merits—sufficiently mirrors the PSG Salvadoran women—which it didn't—such that an analysis of the former necessarily resolves the latter. At a minimum, that's a call for the BIA, not us, to make since the agency is entrusted with decisions relating to relief from removal. *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 517 (2009) ("When the BIA has not spoken on a matter that statutes place primarily in agency hands, [our] ordinary rule is to remand to allow the BIA . . . to address the matter in the first instance in light of its own expertise." (cleaned up)); *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) ("Established precedent

12

dictates that a court may not guess at what an agency meant to say, but must instead restrict itself to what the agency actually did say.").

Because the BIA committed reversible error by mistakenly treating Alvarado-Paz's PSG Salvadoran women as having been raised for the first time before it and then declining to consider the merits of her arguments as a consequence, we will grant her petition for review as to this issue only, vacate the final order of removal, and remand for further proceedings.

We now proceed to the other claims for which we conclude no remand or reconsideration is required.

2.

Alvarado-Paz contends a similar error occurred with respect to her proposed PSG "family members of witnesses to crime," which the BIA concluded hadn't been raised before the IJ and thus was being asserted for the first time on agency appeal. Our review of the record shows no reversible error because the BIA correctly concluded that Alvarado-Paz was attempting to assert a newly labeled PSG in her briefs to the BIA.

Here, the record reveals that Alvarado-Paz created the confusion she now complains of by referring to a single proposed PSG in multiple ways before the IJ before then asserting two distinct yet related PSGs before the BIA. Specifically, Alvarado-Paz identified only four PSGs in the summary section of her brief to the IJ, one of which was "family members of prosecutorial witnesses." J.A. 200. (The other three delineated PSGs are unrelated and irrelevant to this assessment.) Later in the same brief, Alvarado-Paz discussed this "family members of prosecutorial witnesses" PSG using different terminology, including the

13

phrase "family members of witnesses to crimes." J.A. 208. But it's clear from the structure of her briefing and her arguments that these two characterizations were meant to refer to a single proposed PSG that Alvarado-Paz repeatedly identified as "family members of prosecutorial witnesses." In turn, the IJ's decision referred to this PSG as it had repeatedly been identified, "family members of prosecutorial witnesses," and it never referred to a different variation, nor identified a fifth PSG, "family members of witnesses to crimes." J.A. 86.

Alvarado-Paz's briefing before the BIA suggested—for the first time—that she was treating these two groups as independent and distinct PSGs. In the heading to the relevant section, she identified "'family members of prosecutorial witnesses to crime' *or* 'family members of witnesses to crime.'" J.A. 49 (cleaned up). And in the text of that section, she refers to the PSG "family members of prosecutorial witnesses" and "the additional" PSG "family members of witnesses to crime." J.A. 50–51.

Critically, however, Alvarado-Paz bore "the burden of raising *all* particular social groups and specifying 'the exact delineation of any particular social group(s) to which she claims to belong' on the record *before the immigration judge in the first instance*." *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 214 (4th Cir. 2020) (quoting *Matter of W-Y-C & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018)) (second emphasis added). Given this burden and in light of the entire record, the BIA did not commit reversible error in determining that Alvarado-Paz had solely raised before the IJ the PSG "family members of prosecutorial witnesses to crime," but not the PSG "family members of witnesses to crime." After all, Alvarado-Paz's briefing to the IJ consistently identified the former

14

formulation as the "label" for her proposed relevant PSG. Consistent with Alvarado-Paz's designation, that's also how the IJ identified her proposed PSG. And in her briefing before the BIA, Alvarado-Paz didn't assert that the IJ had failed to consider a fifth proposed PSG (family members of witnesses to crime). Instead, she maintained for the first time that they were two alternative PSGs. But it was Alvarado-Paz's burden to specify *before the IJ* the precise formulation she was relying on as the basis for her claim. *See id.* Accordingly, the BIA did not commit reversible error with respect to this PSG.

B.

Alvarado-Paz next contends that the agency erred in denying asylum or withholding of removal under the INA based on her political opinion and three PSGs: (1) females viewed as property by virtue of their status in the family relationship; (2) the nuclear family of Porfiria; and (3) family members of prosecutorial witnesses.[3] As for her political-opinion claim, she maintains that she persistently sought to hold her mother's murderers responsible under the law and through the justice system, received death threats after expressing those opinions, and was thus persecuted on account of her political opinion. And as for her claims based on membership in the three above PSGs, Alvarado-Paz argues that the record shows the requisite nexus, which requires only that her PSG be a central

---

[3] As noted with respect to the Salvadoran women PSG, despite stating that it was adopting and affirming the IJ's decision, the BIA necessarily didn't do so. But to the extent the BIA correctly apprehended other aspects of the IJ's decision, its own decision to adopt and affirm that analysis means that we consider both decisions on review. *See Cordova*, 759 F.3d at 337.

15

reason for her persecution. She also faults the BIA for adopting what she terms the IJ's flawed analysis and conclusions without engaging in its own assessment.

Substantial evidence supports the BIA's determination that Alvarado-Paz failed to show that she espoused her proffered political opinion of opposing violence in favor of the rule of law. None of Alvarado-Paz's arguments contradict the core problem identified by the IJ—her advocacy on this "political" issue was limited to promoting justice for her mother's killer(s). That cannot by itself reflect a desire to promote the rule of law *generally* as a potentially cognizable political opinion. Nothing Alvarado-Paz points to in the record undermines, much less compels the opposite conclusion to, the agency's assessment. *See Mulyani*, 771 F.3d at 197. Accordingly, we deny Alvarado-Paz's petition insofar as it challenges the denial of relief based on her political-opinion claim.

Alvarado-Paz's challenge to the BIA's no-nexus determination that doomed her other PSG-based claims fares no better. Her opening brief asserts only that *the BIA* erred by failing to undertake an independent review of the record before dismissing her claims. But the BIA "adopt[ed] and affirm[ed]" the IJ's decision and concluded there was no "clear error of fact or any error of law" relating to the IJ's no-nexus determination. J.A. 8. And when "conducting clear error review, the BIA *may not* reweigh evidence or substitute its own judgment for that of the IJ." *Funez-Ortiz*, 127 F.4th at 505 (cleaned up) (emphasis added); *cf. Cortez-Mendez*, 912 F.3d at 209 (reiterating that whether a nexus has been shown is a "question of fact entitled to deference and reviewed for clear error"). The BIA's

16

approach when reviewing the IJ's no-nexus determination was consistent with its charge.[4] Accordingly, we deny her petition to the extent it is based on the agency's denial of her claims based on the PSGs (1) females viewed as property by virtue of their status in the family relationship; (2) the nuclear family of Porfiria; and (3) family members of prosecutorial witnesses.

## III.

Last, Alvarado-Paz challenges the denial of her claim for relief under the CAT. She asserts that the BIA and IJ erred in concluding that the record didn't show she would be tortured by or with the acquiescence of public officials or those acting in an official capacity.

To qualify for relief under the CAT an applicant must show that it is "more likely than not that [she] would be tortured if removed to the proposed country of removal."

---

[4] Notably, the cases Alvarado-Paz cites in support of her argument address the distinct scenario where *the IJ's* initial assessment didn't appropriately engage with record evidence, which in turn led to some error in how the BIA reviewed the applicant's claim. *E.g.*, *Quintero*, 998 F.3d at 646 ("[B]oth the immigration judge and the Board of Immigration Appeals failed to meaningfully engage with the extensive [documentary evidence] submitted by Petitioner."); *Portillo Flores*, 3 F.4th at 630 (vacating a removal order when "both the IJ and BIA failed to provide a meaningful analysis of whether Petitioner established a well-founded fear of future persecution").

These cases are readily distinguishable because Alvarado-Paz's opening brief took issue only with the BIA's failure to *reassess* the record. It didn't argue that the IJ failed to meaningfully engage with the evidence in the first instance. So, Alvarado-Paz has not shown that the BIA's approach was erroneous under the circumstances presented.

True, Alvarado-Paz did later assert that the IJ committed its own flawed assessment in reaching its no-nexus determination. But she didn't do so until her reply brief. We don't ordinarily consider arguments that are presented for the first time in a reply brief, and we won't do so here. *See United States v. Caldwell*, 7 F.4th 191, 212 n.16 (4th Cir. 2021).

17

*Portillo Flores*, 3 F.4th at 637 (quoting *Mulyani*, 771 F.3d at 200); 8 C.F.R. § 1208.16(c)(2). "Torture is defined as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Portillo Flores*, 3 F.4th at 637 (quoting 8 C.F.R. § 1208.18(a)(1)); *McDougall v. Bondi*, 150 F.4th 637, 642 (4th Cir. 2025) (characterizing the second part of this standard as showing that "this likely future mistreatment will occur at the hands of government officials or with the consent or acquiescence of government officials" (cleaned up)). "Acquiescence" requires prior awareness, i.e. "a finding of either actual knowledge or willful blindness." 8 C.F.R. 208.18(a)(7).

At bottom, Alvarado-Paz asks us to reassess the record evidence and reach the opposite conclusion about whether Salvadoran officials will acquiesce in her torture upon her return. But our "task at this juncture is not to reweigh evidence and determine which of the competing views [of the record] is more compelling. Instead, it is to ensure that substantial evidence supports the BIA's judgment . . . and that unrebutted, legally significant evidence was not arbitrarily ignored[.]" *Kouyate v. Garland*, 122 F.4th 132, 142 (4th Cir. 2024) (cleaned up). In undertaking our charge, we "presume that, in reaching [their] conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence." *Id.* (quoting *Martinez v. Holder*, 740 F.3d 902, 914 (4th Cir. 2014)).

Nothing in the record or the agency's assessment of Alvarado-Paz's CAT claim leads us to conclude that reversible error has occurred. Most significant to our review, we

18

note that the BIA and IJ specifically considered—and rejected—Alvarado-Paz's argument that how the Salvadoran authorities responded to her mother's murder demonstrated that they would acquiesce in her torture upon her return. And that assessment is supported by the record evidence, which includes Alvarado-Paz's own testimony regarding the investigation that followed her mother's murder. *See* 8 C.F.R. § 208.18(a)(7); *Zelaya v. Holder*, 668 F.3d 159, 161–62 (4th Cir. 2012) (reiterating the standards for acquiescence).

In addition, while Alvarado-Paz's country-conditions report supports that gender-based violence sometimes goes unpunished in El Salvador, that evidence does not meet Alvarado-Paz's burden for relief under the CAT. *See, e.g.*, *Kouyate*, 122 F.4th at 143 (reflecting that "generalized [reports of] violence and civil strife" are "insufficient to established eligibility for deferral of removal under the CAT"); *Gomez-Ruotolo v. Garland*, 96 F.4th 670, 686 (4th Cir. 2024) ("[T]he mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured." (cleaned up)).

All told, nothing in the record compels the conclusion that Alvarado-Paz is more likely than not to be tortured by or with the consent or acquiescence of a Salvadorian public official or person acting in an official capacity. Accordingly, we deny the petition for review insofar as it challenges the agency's denial of relief under the CAT.

## IV.

For the reasons stated, we grant Alvarado-Paz's petition for review in part because the BIA incorrectly deemed Alvarado-Paz to have forfeited agency appellate review of her

19

claim based on membership in the PSG Salvadoran women. But we deny her petition for review insofar as it challenges the BIA's resolution of her remaining arguments for asylum and withholding of removal under the INA, and for withholding of removal under the CAT. We thus vacate the agency's removal order and remand to the BIA for further proceedings consistent with this opinion.

*PETITION FOR REVIEW*
*GRANTED IN PART*
*AND DENIED IN PART;*
*VACATED AND REMANDED*